Petros A. PALANDJIAN, Plaintiff,

v.

Ashraf PAHLAVI, Defendant.

Civ. A. No. 83–2199–Y.

United States District Court,
D. Massachusetts.

Aug. 16, 1985.

See also, D.C., 586 F.Supp. 671.

M. Frederick Pritzker, Elizabeth A. Ritvo, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for plaintiff.

Harvey Weiner, Peabody & Arnold, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiff in this action, Petros A. Palandjian ("Palandjian"), seeks damages in excess of $30 million on his claims of breach of contract, conversion, unjust enrichment, quantum meruit, and breach of fiduciary duty. The defendant, Ashraf Pahlavi ("Pahlavi"), moves for summary judgment on all counts, claiming that the action is barred both by the statute of limitations and by the statute of frauds. For the reasons that follow, Pahlavi's motion is denied.

## I. *Background*

Palandjian is a dual national Iranian-American citizen who has been a resident of the United States since 1963. The defendant Pahlavi is the twin sister of the late Shah of Iran and currently is living in exile. Palandjian alleges the following facts and this court, expressing no opinion thereon, assumes them to be true for purposes of this motion only.

In 1966, Palandjian resided in Massachusetts and was the president of a construction company located in Watertown, Massachusetts. In June of 1966 he first met Pahlavi through his brother Leon Palandjian ("Leon"), who worked for Pahlavi in Iran. During the course of several meetings over a weeklong period in various locations in Massachusetts, Pahlavi and Palandjian entered into an oral contract whereby they agreed to develop a holiday resort, named "Kazar Shahr," on the Caspian Sea in Iran. By this agreement, Pahlavi would purchase the necessary real estate, Palandjian would provide up to $2 million as an initial investment, and he and his brother Leon would form a new company to develop and construct the project, all profits being divided equally between Pahlavi and Palandjian. Palandjian agreed to oversee the development of the project from his office in Massachusetts and to visit the site in Iran as necessary.

During the June 1966 meetings in Massachusetts, Pahlavi and Palandjian also discussed the need and demand for aviation development in Iran. They agreed to contact Cessna Aircraft to seek the exclusive distributorship for Iran; if successful, Palandjian was to have an 85% interest and Pahlavi a 15% interest. Neither this agreement nor the agreement to develop Kazar Shahr were put in writing—Palandjian did not ask Pahlavi to sign a written contract for fear of insulting her.

Pursuant to these agreements, Palandjian and his brother Leon formed a company,

called Abadani Jazayer, to develop the Kazar Shahr project. Because he was a resident of Iran, Leon was named president of the company. The shares of Abadani Jazayer stock were given to the plaintiff's father, Grigor Palandjian, to hold in his safe in Tehran on the basis of 50% for the benefit of Palandjian and 50% for the benefit of Pahlavi.

Palandjian also obtained the exclusive distributorship in Iran for Cessna Aircraft. Palandjian and his brother formed a company named Hooraseman to sell aircraft and parts, and each of the brothers was named individually as a Cessna representative. Leon was named president of Hooraseman and the company shares were held by the plaintiff's father in Tehran.

From 1966 through July 1969, Palandjian supervised the development of the Kazar Shahr project from his Watertown, Massachusetts, office and from periodic site visits. During this period he was in frequent telephone contact from his Massachusetts home and office with Pahlavi regarding the project. In July 1969, Leon died, and Palandjian moved to Iran to assume his brother's responsibilities as president of both the Abadani Jazayer and the Hooraseman companies. From July 1969 through December 1970 Palandjian resided in Tehran except for several brief trips to Massachusetts to visit his family.

Following extensive site development, the Kazar Shahr project was ready for marketing in 1970. In December 1970, Palandjian had a dispute with Pahlavi concerning the amount of time he was spending in Iran. Palandjian proposed that they sell the Abadani Jazayer and Hooraseman companies, a suggestion which angered Pahlavi. While discussing this matter in France, Pahlavi sent the following written message to Palandjian:

> I swear to my highest beliefs that you will never set foot in Iran while I am alive. You are free to leave here whenever you want even if you want to leave tonight.
>
> P.S. You are free to go whereever you want.

Fearing for his safety, Palandjian did not return to Iran. He moved back to his home in Massachusetts and, from there, continued to supervise the activities of Abadani Jazayer and Hooraseman.

In 1971, Pahlavi moved to wrest control of the two companies from Palandjian. Early that year a representative of Pahlavi went to the Abadani Jayazer offices in Tehran and announced that he was taking over the company and that all documents and models should be turned over to him. The staff reluctantly complied with those demands. At approximately the same time Pahlavi's top assistant, Izadi, visited the plaintiff's father Grigor and demanded the shares of Abadani Jazayer and Hooraseman held by Grigor. According to Grigor's deposition testimony, Izadi stated: "We will have you killed," and "If you and your son and family want to live here without any danger give me the stocks."

Grigor contacted Palandjian about the threats from Izadi, and Palandjian spoke with Pahlavi at least twice about her intent to obtain possession of the shares. Pahlavi replied that she would hold Palandjian's shares for his benefit. Fearing for Grigor's safety and relying on Pahlavi's statement that she would hold the Abadani Jazayer and Hooraseman shares for his benefit, Palandjian advised his father to release the stock of both companies to Izadi, which his father did.

Shortly thereafter, in 1971, Palandjian was visited in Massachusetts by Pahlavi's cousin, Dadsetan. Dadsetan told Palandjian that he either had to return to Iran at Pahlavi's request or he had to relinquish his rights to the Cessna distributorship. Still fearing Pahlavi's previous threats, Palandjian was unwilling to return to Iran. Dadsetan became more belligerent, stating "She wants Cessna Aircraft. She wants you to give up Cessna if you're not coming back." Dadsetan further stated, "I'm sure you won't want to take a chance and have something unpleasant happen to your mom, to your dad. They have a pleasant life." Palandjian called Pahlavi about Dadsetan's threats and was told that Dadsetan was

her representative and that Palandjian was to do as he was told. Pahlavi added, "You don't have to if you don't want to. That's up to you. You decide." In response to a request for payment, Pahlavi stated, "Don't worry about the money. You will get paid." Fearing the possible consequences to him and his family, Palandjian signed papers which relinquished his rights to the Cessna distributorship.

From 1971 through 1982 Palandjian remained in contact with Pahlavi, speaking with her by phone and periodically meeting with her in Geneva or New York. During these conversations, Palandjian repeatedly raised the issue of monies Pahlavi owed him from Hooraseman and Abadani Jazayer. According to Palandjian, Pahlavi acknowledged her debts and told him that he would be paid. Palandjian summarized the circumstances of one meeting: In 1972 he met Pahlavi in Geneva and again asked her for payment. Pahlavi stated that she had instructed her assistant to pay Palandjian $1.7 million for the unpaid construction work he had performed for the Kazar Shahr development; she also told him that Kazar Shahr had already made $25 million and would make in excess of $50 million, and that he would be paid his share of the profits. In response, Palandjian informed her that he had not received any payment whatsoever.

The Shah of Iran was deposed in 1978 and died in 1980. For some time after 1978 Palandjian believed that the Pahlavi family would return to power eventually and that "the royal family through its agents would exercise power and control while out of power ... outside of Iran." In 1983 Palandjian came to believe that the Pahlavi family would not return to power in Iran and that he could safely litigate his claims against Pahlavi. Palandjian commenced this suit on July 27, 1983.

## II. *The Statute of Limitations Defense*

■ When a defense of statute of limitations is properly raised, the burden is on the plaintiff to prove that he has complied with the relevant statutes. *Holtzman v. Proctor, Cook & Co., Inc.*, 528 F.Supp. 9, 14 (D.Mass.1981). The Massachusetts stat-

ute of limitations applies in this diversity case. *Molinar v. Western Electric Co.*, 525 F.2d 521, 531 (1st Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976). The statute of limitations for contract actions provides that such actions shall be commenced within six years after the cause of action accrues. Mass.Gen.Laws ch. 260, § 2. For claims arising in tort, the Massachusetts statute provides a two-year limitations period for claims arising before January 1, 1974, and a three-year limitations period for claims arising on or after that date. Mass.Gen. Laws ch. 260, § 2A; *Baldassari v. Public Finance Trust*, 369 Mass. 33, 43, 337 N.E.2d 701 (1975).

## A. *Counts I, II, IV, and V*

■ A cause of action for breach of contract accrues at the time of the breach. *Campanella & Cardi Construction Co. v. Commonwealth*, 351 Mass. 184, 185, 217 N.E.2d 925 (1966). Palandjian alleges in Count I that Pahlavi breached their oral contract by "her failure to pay the plaintiff for his profits in the Kazar Shahr development and for the construction work performed on said project, and by preventing the plaintiff from returning to Iran to complete the project." Amended Complaint ¶ 34.

Palandjian's own version of the facts confirms that this alleged breach of contract occurred no later than 1971, when Pahlavi forced him to relinquish control of his interest in the Abadani Jazayer and Hooraseman companies. Similarly, Palandjian's quantum meruit claim in Count IV is based on Pahlavi's failure to pay him the reasonable value of the construction work on the Kazar Shahr project, work which was completed by 1971. Thus, the limitations period on the breach of contract claim (Count I) and the quantum meruit claim (Count IV) ordinarily would have expired no later than 1977, six years before this action was filed.

■ A similar analysis applies to Palandjian's claim for conversion (Count II). A cause of action in tort accrues at the time

of injury to the plaintiff. *Cannon v. Sears, Roebuck & Co.*, 374 Mass. 739, 374 N.E.2d 582 (1978). Palandjian's conversion claim rests upon allegations that Pahlavi through her agents converted (1) Palandjian's property rights in the Cessna Aircraft distributorship in Iran, and (2) Palandjian's interest in the Kazar Shahr project. Amended Complaint ¶ 36. Because these events took place in 1970 and 1971, the limitations period for the conversion claim ordinarily would have expired no later than 1973.

Palandjian contends in Count V that Pahlavi breached her fiduciary duty to him "arising from the contract entered into between Plaintiff and Defendant" and "arising from her holding of the Plaintiff's shares in Abadani Jazayer and Hooraseman Corp. since at least 1971." Amended Complaint ¶ 48. Assuming that the parties did indeed stand in fiduciary relation to one another, *see Cann v. Berry*, 293 Mass. 313, 316, 199 N.E. 905 (1936), there is nothing in the record to suggest that this cause of action rests on any different footing than Palandjian's other tort and contract claims. Indeed, as Palandjian has himself characterized the claim, it arises from the 1971 breach of contract and Pahlavi's holding of shares "since at least 1971." Accordingly, this court rules that the cause of action for breach of fiduciary duty accrued in 1971.

Palandjian concedes that under ordinary circumstances his complaint would be untimely. However, he contends that the applicable statutes of limitations for all counts of the amended complaint have been tolled on the ground of "duress."

### B. *Duress*

Palandjian asserts that he was in fear of the defendant and the Pahlavi family from 1970 until 1983, and not until 1983 did he come to believe that he could safely bring litigation to enforce his rights against this defendant. He argues that as a consequence of this continuous duress, the relevant limitations periods did not begin to run until 1983, and that all of his claims have therefore been brought in a timely manner.

Palandjian has presented substantial evidence that he was subject to duress by Pahlavi when he relinquished his interests in Abadani Jazayer, Hooraseman, and the Cessna distributorship. According to his allegations, in 1970 Pahlavi told him never to set foot in Iran while she was alive. In 1971, Pahlavi and her agent forced Palandjian to give up his property by threatening the safety of his family. Also in 1971, Pahlavi's agent made direct threats to Palandjian's father in Iran.

However, the issue is not whether Palandjian was under duress in 1971. The situation here is considerably different from more typical duress cases, in which a party seeks to avoid an apparent legal obligation on the ground that he agreed to such an obligation under duress. Thus, many of the authorities cited by Palandjian are inapplicable. *See, e.g., Omansky v. Shain*, 313 Mass. 129, 46 N.E.2d 524 (1943) (plaintiff not entitled to collect on promissory note because he had coerced the defendant into signing it). The question here is whether the duress experienced by Palandjian should excuse the lengthy delay in bringing this action.

An initial question is whether, under Massachusetts law, a court may recognize a duress exception to the statutes of limitations under any circumstances. The Massachusetts legislature has specifically defined several circumstances under which the statutes of limitations may be tolled, and duress is not one of them. *See* Mass. Gen.Laws ch. 260. Pahlavi makes a strong argument that this court should not create a duress exception in the absence of legislative direction. *See* 51 Am.Jur.2d, *Limitations of Actions* § 138 at 708 (1970) ("While most courts give recognition to certain implied exceptions arising from necessity, it is now conceded that they will not, as a general rule, read into statutes of limitation an exception which has not been embodied therein, however reasonable such exception may seem and even though the exception would be an equitable one.").

In *Babco Industries, Inc. v. New England Merchants Nat. Bank*, 6 Mass.App.

929, 380 N.E.2d 1327 (1978), the court rejected the plaintiff's "duress exception" argument but stated in dictum, "It is possible to imagine circumstances in which duress might toll the statute." *Id.* at 930, 380 N.E.2d 1327. Likewise, the "duress exception" appears to have been recognized in this District in a closely related case. *Pahlavi v. Palandjian,* No. 83–0437–Z, slip op. at 4–5 (D.Mass. May 30, 1985).

Even where other courts have entertained the view that duress might toll the running of the statute of limitations, however, they have uniformly agreed with the *Babco* court that such an exception would be available only under very unusual circumstances. For example, in *Cooper v. Fidelity-Phila. Trust Co.,* 201 F.Supp. 168 (E.D.Pa.1962), the plaintiff claimed that the defendants threatened to have him committed to a mental institution if he sought to enforce his legal rights. Noting that "[t]here is little authority for the proposition that 'duress' tolls the running of the statute of limitations," the court held that such threats would not constitute duress. *Id.* at 170; *see Philco Corp. v. Radio Corp. of America,* 186 F.Supp. 155, 162 (E.D.Pa. 1960) (court was "unable to discover a single case which has recognized such a defense in this [antitrust] area of the law"). A New York appellate court recently summarized the law in this area as follows:

> While other jurisdictions have suggested or assumed the possibility for the purpose of argument that duress might toll the limitations period for causes of action not based on duress, the ultimate resolution in each case was to reject duress as a toll on the facts presented. Whether reluctance to recognize duress as a toll lies in the undesirability of a rule that turns on the reasonableness of reliance upon threats of physical or economic harm, the ease of fabrication of such threats, or simply in the judicial reluctance to create an entirely new defense to the Statute of Limitations, ... we are not inclined in this case to attempt overthrow of the old rule.

*Baratta v. Kozlowski,* 94 A.D.2d 454, 459, 464 N.Y.S.2d 803, 807 (1983) (citations omitted).

■ To toll the running of the statute of limitations, the alleged duress must be directed at preventing the plaintiff from filing suit or otherwise enforcing his legal rights. *Jastrzebski v. City of New York,* 423 F.Supp. 669, 673 (S.D.N.Y.1976). In particular, the plaintiff must allege facts of duress which go "beyond those which comprise the alleged torts in suit." *Id.* As noted above, in this case Palandjian certainly has presented evidence of duress in 1971 —Pahlavi converted his property to her own use by threatening him and his family. As unconscionable as these alleged threats are, they do not relate to the filing of any legal action. The record does not contain any evidence of any threat or coercive act by the defendant after 1972, despite the fact that Palandjian communicated regularly with Pahlavi over the course of the next decade. In particular, there is no evidence of any threat or act to deter the filing of this lawsuit.

■ Palandjian argues that the fear induced by the Pahlavi's actions in the 1970–1972 period lasted continuously for more than 10 years and remained sufficiently strong to dissuade him from filing suit until 1983. Even assuming this fear was reasonable, the plaintiff's subjective fear cannot by itself govern the application of the statute of limitations. A similar argument was rejected by the court in *Jastrzebski v. City of New York,* 423 F.Supp. 669 (S.D.N.Y.1976):

> Reduced to their essentials, plaintiff's allegations are that he was so intimidated by the tortious acts of defendants that, without any further actions on their parts, he was deprived of a free will to institute his suit against them. This argument, if accepted, would prove too much, for any plaintiff—the victim of an assault, or a battery, or a defamation, for instance—could argue that he was subjectively so intimidated or traumatized by the tortious conduct of his adversary that he was unable to bring suit until

some time well beyond the period established by the legislature for the institution of such actions. If, in each instance, the trial court were forced to make an *ad hoc* determination of the severity of the plaintiff's subjective fear in order to determine whether to waive the effect of the statute of limitations, then obviously the courts would be burdened by a plethora of preliminary inquiries which could defeat the very purposes which the statutes of limitations were designed to serve.

*Id.* at 674.

Here Palandjian would have a stronger case if Pahlavi or her agents "had actually approached him at some point and threatened him with dire consequences if he were to institute his litigation." *Id.* As in *Jastrzebski,* Palandjian simply has alleged that he was afraid Pahlavi *might* retaliate if he filed suit. "[T]he mere fact that the plaintiff *anticipated* duress does not establish it as a legal defense." *Id.* (quoting *Philco Corp. v. Radio Corp. of America,* 186 F.Supp. 155, 162 (E.D.Pa.1960)) (emphasis in original).

Palandjian points out that another judge in this district, on allegations virtually indistinguishable from those in the present case and upon the authority of *Ross v. United States,* 574 F.Supp. 536, 542 (S.D. N.Y.1983), has ruled that Palandjian's "claim of duress has raised a sufficient issue of fact to withstand plaintiff's motion for summary judgment." *Pahlavi v. Palandjian, supra,* at 1572. With respect, it seems to me that while *Ross* does provide some authority for Palandjian's duress argument, it is distinguishable from this case and thus the averments of the affidavits opposing summary judgment fall short of establishing any material issue of fact.

In *Ross,* the plaintiff was a former prison inmate who alleged that the defendant prison officials mistreated him and wrongfully delayed in granting him parole. When the plaintiff was finally released from prison—following three successful habeas corpus petitions in federal court—he waited until he was no longer on parole (one year after the limitations period ordinarily would have expired) before filing suit. He alleged that he did not file the action earlier because he was still on parole and he feared retaliation from the defendants, who still had certain legal power over him. The court held that the defendant's alleged facts were sufficient to invoke a duress defense, relying on the principle that a limitations period may be tolled "when a *paramount authority* prevents a person from exercising his legal rights." *Id.* at 542 (emphasis added); *see Davis v. Wilson,* 349 F.Supp. 905, 906 (E.D. Tenn.) (statute of limitations may be tolled a "reasonable time" where the defendant sheriff allegedly took the plaintiff's legal papers from his cell), *aff'd,* 471 F.2d 653 (6th Cir.1972).

In this case, Palandjian has not alleged that Pahlavi had any legal or paramount authority over him. According to Palandjian, he was a citizen of the United States and resided in this country continuously after 1970. Although Palandjian has implied that Pahlavi's retaliatory power extended to the United States from 1970 through 1982, he has offered no tangible evidence of such power and this court is not in a position to speculate on that matter. For these reasons, *Ross* does not appear to be compelling authority for purposes of this case.

■ The ruling by my colleague in *Pahlavi v. Palandjian,* however, is entitled to considerable deference and much greater weight. "If the precedent is from a sitting judge in one's own court and represents [her] mature reflection, the argument in favor of following it rests not only on the appropriate amenities, but also on profounder considerations of equality in the treatment of litigants." Wyzanski, "The Essential Qualities of a Judge," from *The New Meaning of Justice* (1956), reprinted in *Handbook for Judges* 96 (American Judicature Society 1975). These considerations have especial force here where Palandjian himself is a litigant in both cases, and I completely agree that a duress exception can theoretically toll the statutes of limitations. My reservations flow only from the limited scope I would afford to the reason-

ing in *Ross* and my own reading of affidavits which are substantially similar in both this case and *Pahlavi v. Palandjian.* Thus the question is simply put: ought this court reject the proffered duress exception and dismiss the action notwithstanding *Pahlavi v. Palandjian,* or ought it follow the reasoning of that decision, deny the motion for summary judgment, and order the case for trial? The first course has the advantage of permitting a prompt appeal to conclusively determine the legal issue; the second results in deciding like cases alike at the trial level.

Fortunately, the flexible provisions of 28 U.S.C. § 1292(b) admit of an accomodation of both concerns. The extent of the duress exception to the running of the Massachusetts statutes of limitations is here "a controlling question of law as to which there is substantial ground for difference of opinion." Therefore, this court will deny the motion for summary judgment upon the grounds expressed in *Pahlavi v. Palandjian*—thus insuring that Palandjian is treated uniformly in each of his two related lawsuits. In view of my reservations as to this result, however, this court is of opinion "that an immediate appeal from [this] order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Accordingly, Pahlavi has ten days after the entry of the denial of this motion for summary judgment to apply to the Court of Appeals for permission to proceed with an appeal therefrom. *Id.* In this fashion, both uniform application of the law and prompt appeal may be accomplished.

### C. *Count III (and Count V Revisited)*

Palandjian contends in Count III that Pahlavi has been unjustly enriched by her actions in obtaining "rights and title to the Plaintiff's property" and asks the court to impose a constructive trust for his benefit. Amended Complaint ¶¶ 38, 39. *See Barry v. Covich,* 332 Mass. 338, 342, 124 N.E.2d 921 (1955) (a constructive trust may be employed in equity in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in

violation of a fiduciary relationship). Palandjian further contends that the limitations period for this claim is six years and that the cause of action accrued after 1982. In response, Pahlavi argues that Count III is simply a restatement of the conversion claim (Count II) and is therefore barred by the applicable two-year statute of limitations.

 In Massachusetts, the statutes of limitations applicable to law actions based on contract and tort are also applicable to suits in equity. *Desmond v. Moffie,* 375 F.2d 742, 743 (1st Cir.1967). The court must look to the "gist of the action" or the essential nature of the plaintiff's claim in determining what statute of limitations to apply. *Hendrickson v. Sears,* 365 Mass. 83, 85, 310 N.E.2d 131 (1974). Although Palandjian's unjust enrichment claim does rest in part on the circumstances of the alleged conversion, it also arises from the breach of contract allegations. "The usual form of action to recover from another money which in equity and good conscience he is not entitled to keep is in contract." *Kagan v. Levenson,* 334 Mass. 100, 103, 134 N.E.2d 415 (1956). Therefore, the six-year statute of limitations for actions of contract applies to Count III. *Brodeur v. American Rexoil Heating Fuel Co.,* 13 Mass.App. 939, 940, 430 N.E.2d 1243 (1982) (six-year limitations period applies to action seeking the declaration of a trust based on an implied contract).

The six-year limitations period does not assist Palandjian, however, unless the cause of action for unjust enrichment accrued after July 1977. Palandjian reasons that his cause of action accrued after 1982, because: while he was forced by Pahlavi in 1971 to give up his shares in the Abadani Jazayer and Hooraseman companies and to relinquish his rights to the Cessna distributorship, he was told by Pahlavi that she was holding these shares and interests for his benefit. Between 1971 and 1982 he remained in contact with Pahlavi and, each time he requested payment from her, she acknowledged her debts and assured him that eventually he would be paid. According to Palandjian, it was not until after 1982 that he had reason to know Pahlavi

"was holding the shares adversely to him." Palandjian is essentially arguing that his cause of action for unjust enrichment did not accrue until the implied trust was "repudiated" or otherwise terminated to his knowledge. *See Brodeur v. American Rexoil Heating Fuel Co.*, 13 Mass.App. 939, 940, 430 N.E.2d 1243 (1982). Although he points to no clear expression of repudiation by Pahlavi in 1982 or 1983, he alleges that it became clear after 1982 that Pahlavi had no intention of paying him.

■■■ It is true that in the case of express or resulting trusts, the statute of limitations does not begin to run until the trustee has repudiated the trust and knowledge of that repudiation has come home to the beneficiary. *Kearney v. Mechanics Nat. Bank*, 343 Mass. 699, 703, 180 N.E.2d 667 (1962); *see Burns v. Massachusetts Institute of Technology*, 394 F.2d 416, 419 (1st Cir.1968); *Hanrihan v. Hanrihan*, 342 Mass. 559, 567, 174 N.E.2d 449 (1961). However, Palandjian's claim is not based on an express or resulting trust; instead, he seeks a declaration that a *constructive* trust should be imposed to avoid unjust enrichment. A constructive trust is not a substantive device but merely an equitable remedy to compel a person not justly entitled to property to transfer it to another. *Davies v. Krasna*, 14 Cal.3d 502, 121 Cal. Rptr. 705, 714, 535 P.2d 1161, 1170 (1975). As a general rule, the "repudiation" requirement does not apply to a constructive trust imposed as a remedy by the court. *Burns v. Massachusetts Institute of Technology*, 394 F.2d 416, 419 (1st Cir.1968); *see Currier v. Studley*, 159 Mass. 17, 20, 33 N.E. 709 (1893).

Although there is no formal "repudiation" requirement for constructive trusts, "the statute [of limitations] begins to run in favor of the [constructive trustee] against the [beneficiary] ... at the time when the holder of title begins to hold adversely." *Currier v. Studley*, 159 Mass. 17, 20, 33 N.E. 709 (1893); Scott on Trusts § 481.1 (3d ed. 1967).

On this theory, then, the key legal question is when Pahlavi began holding Palandjian's property adversely to him. Given the circumstances under which Palandjian says he was forced to give up his interests in Abadani Jazayer, Hooraseman, and the Cessna distributorship, he can hardly be heard to suggest that Pahlavi acquired and continued to hold these interests on his behalf. According to Palandjian himself, he relinquished his rights unwillingly and only after threats of severe bodily harm by Pahlavi and her representatives against his family and himself.

True, Palandjian also asserts that, at the time Pahlavi forced him to give up his stock, she told him that she would "hold the shares for [him]."[1] But even if it is true that Pahlavi acknowledged her debt and promised to pay it eventually, it does not follow that she became his agent thereby. "In the ordinary case a plaintiff's discussions with a defendant do not postpone the accrual of the cause of action until he is satisfied that the defendant is going to do nothing for him." *Burns v. Massachusetts Institute of Technology*, 394 F.2d 416, 417 (1st Cir.1968); *see Aetna Casualty & Surety Co. v. Bell*, 390 F.2d 612, 613–14 (1st Cir.1968) (The rule "cannot be ... that the cause of action accrues only when the settlement talks break down. This would make the policy limitation close to meaningless."); *see also Dolmetta v. Uintah Nat. Corp.*, 712 F.2d 15, 19 (2d Cir.1983) (action for unjust enrichment due to defendants' fraudulent acquisition of stock accrued at the time defendants acquired such stock).

■■■ Of course, faced with Pahlavi's motion for summary judgment, Palandjian is entitled to have his affidavits in opposition read indulgently and this court must draw in his favor such inferences as are reasonable to ascertain whether a genuine issue in fact exists. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Moreover, this court acknowledges

---

**1.** Palandjian properly does not assert that these and the related statements by Pahlavi started the statute of limitations running afresh. Mass.

Gen.Laws c. 260, § 13. *David v. Zilah*, 325 Mass. 252, 255–56, 90 N.E.2d 343 (1950) (Spalding, J.).

that on this record, it is a close question whether a reasonable jury could wholly disregard the claim of duress (thus demolishing all the other counts of the complaint—except, perhaps, Count V) and nevertheless, based solely upon what remains, conclude that Pahlavi was genuinely acting on Palandjian's behalf and only renounced her trust in 1982. Certainly, this court would not so find.

It is unnecessary, however, to determine the matter upon the factual sufficiency of the opposing affidavits as a more basic concern prevents a ruling for Palandjian on the theory advanced above. While Palandjian has every right to plead in the alternative, Fed.R.Civ.P. 8(a), the time for the maintenance of inconsistent factual positions has long since passed when, as is the case here, the court is required to resolve a motion for summary judgment made after such extensive discovery that neither party seeks to advance additional evidence pursuant to Fed.R.Civ.P. 56(f).

Long and firmly established principles of common law provide that

2. In *Callanan Road Improvement Co. v. United States*, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206 (1953), the Callanan Road Improvement Co. had applied to the I.C.C. for the purchase of an amended certificate to operate freight boats. The Commission authorized the transfer. After the transfer, Callanan filed suit to set aside a modification of the certificate effected by the Commission before the transfer. The Court held that Callanan was estopped to deny the Commission's power to issue the certificate in its modified form, stating:

The appellant cannot blow hot and cold and take now a position contrary to that taken in the proceedings it invoked to obtain the Commission's approval. If the appellant then had taken the position it seeks now, the Commission might conceivably have refused its approval of the transfer. The appellant accepted the transfer with the limitations contained in the certificate.

345 U.S. at 513, 73 S.Ct. at 806.

Professor Moore has discussed the doctrine, sometimes referred to as "judicial estoppel" or the doctrine of "preclusion against inconsistent positions," as follows:

Even where the facts will not permit the application of res judicata, collateral estoppel, or the election rule against inconsistent remedies, a party may be precluded by a prior position taken in litigation from later adopting an inconsistent position in the course of a

... a man should not be permitted 'to blow hot and cold' with reference to the same transaction, or insist, at different times, on the truth of each of two conflicting allegations, according to the promptings of his private interests.

Broom, *A Selection of Legal Maxims* 119 (2d ed. 1850) (quoting Lord Kenyon). This doctrine was recognized by the United States Supreme Court in *David v. Wakelee*, 156 U.S. 680, 15 S.Ct. 555, 39 L.Ed. 578 (1895), where the Court stated:

It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*Id.* at 689, 15 S.Ct. at 558.[2]

Since, for the reasons discussed above, Palandjian prevails on the claim of duress,

judicial proceeding. Though the preclusion doctrine is sometimes referred to as 'judicial estoppel' or 'estoppel by oath,' and though it is frequently expressed in language sounding of estoppel in pais, numerous cases illustrate the existence of a doctrine forbidding inconsistent positions, usually as to facts, which operates independently of equitable estoppel.

Many cases forbidding inconsistent positions in judicial proceedings may be grouped conveniently into two classes: those where a party seeks to contradict his own sworn statements made in prior litigation in which he was a party or a witness; and those where the prior inconsistent position was not taken under oath. In the first class of cases the rule against self-contradiction is frequently said to rest upon a policy of preserving the sanctity of the oath, while the other group of cases involves a more general consideration of the orderly administration of justice and regard for the dignity of judicial proceedings. *Both types of preclusion seem to fall, generically, within a universal judicial reluctance to permit litigants to 'play fast and loose' with courts of justice according to the vicissitudes of self-interest.*

1B *Moore's Federal Practice* ¶ 0.405[8] (2d ed. 1974) (emphasis added).

In the case Professor Moore cites for the last quoted sentence, *Scarano v. Central R.R. Co. of New Jersey*, 203 F.2d 510 (3d Cir.1953), Scarano, a railroad worker, had asserted in F.E.L.A. pro-

his claim based upon the alleged repudiation of a constructive trust or fiduciary relationship ought not be entertained. Indeed, even were the result different and were the duress exception to prove unavailing, this court would rule that the present record is insufficient to raise a genuine issue concerning whether, after 1971, Pahlavi was other than a party totally adverse to Palandjian's interests.

For the reasons expressed above, however, this motion for summary judgment must be denied.

## SUPPLEMENTAL MEMORANDUM

On August 16, 1985, this court denied the motion of the defendant Pahlavi for summary judgment, albeit with reservations, after analyzing whether the plaintiff Palandjian's claim of duress was adequate to toll the relevant statutes of limitations. Both parties promptly sought reconsideration, Pahlavi's counsel correctly observing that, were Pahlavi not to prevail on her statute of limitations argument, she is nevertheless entitled to a ruling on her statute of frauds defense to Count I—the contract count. After further hearing, this supplemental memorandum addresses that issue.

*The Statute of Frauds Defense*

Pahlavi has argued that Palandjian's breach of contract claim is barred by the Massachusetts statute of frauds, which generally provides that no action shall be brought upon an agreement that is not to be performed within one year unless that agreement is in writing and signed by the party charged with a breach. Mass.Gen. Laws ch. 259, § 1. According to Pahlavi, the Kazar Shahr development could not have been completed within one year after the alleged oral contract was made, and therefore the contract claim is barred. Palandjian concedes that the entire Kazar Shahr project could not have been completed within one year, but argues that the obligations of the parties under the alleged agreement could have been concluded within that period. Palandjian further contends that Pahlavi is estopped from asserting a statute of frauds defense. Because this court holds that the estoppel doctrine may apply to this case, it is unnecessary to decide whether the alleged contract could have been performed within one year.

The Restatement (Second) of Contracts § 139(1) sets forth the circumstances under which a defendant may be estopped from invoking a statute of frauds defense to a

---

ceedings that he would be unable to work because of injuries incurred on the job. A verdict for a sum of over eleven times his annual salary was returned. The defendant moved for a new trial but the case was settled before a decision on the motion was rendered for a sum of approximately nine times Scarano's annual salary. Subsequently, Scarano sued for breach of his collective bargaining agreement because the railroad refused to reinstate him. The Third Circuit affirmed the district court's dismissal of the action, stating:

> The 'estoppel' of which, for want of a more precise word, we here speak is but a particular limited application of what is sometimes said to be a general rule that 'a party to litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits.' II Freeman on Judgments § 631 (5th ed. 1925). Whether the correct doctrine is that broad we do not decide. The rule we apply here need be and is no broader than this. A plaintiff who has obtained relief from an adversary by asserting

and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention. *Such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate. See Stretch v. Watson,* 1949, 6 N.J.Super. 456, 469, 69 A.2d 596, 603, reversed in part on other grounds, 5 N.J. 268, 74 A.2d 597. And *this is more than affront to judicial dignity. For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.* 203 F.2d at 512–13 (emphasis added).

*See also Smith v. Montgomery Ward,* 388 F.2d 291 (6th Cir.1968), *cert. denied,* 393 U.S. 871, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *Smith v. Boston Elevated Ry. Co.,* 184 F. 387 (1st Cir.1911); *Teamsters Local No. 25 v. Penn. Transportation Corp.,* 359 F.Supp. 344 (D.Mass.1973); *Wood v. United Air Lines, Inc.,* 216 F.Supp. 340 (E.D.N.Y. 1963).

claim falling within the scope of the statute:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

Restatement (Second) of Contracts § 139(1) (1981). Section 139(2) lists several factors which are significant in determining "whether injustice can be avoided only by enforcement of the promise."

The Massachusetts courts have held that the estoppel doctrine may apply in the statute of frauds context. *See Cellucci v. Sun Oil Co.*, 2 Mass.App. 722, 728, 320 N.E.2d 919 (1974) ("[A]n estoppel, if appropriately applied in this case, would also preclude [the defendant] from asserting the affirmative defense of the Statute of Frauds."), *aff'd*, 368 Mass. 811, 331 N.E.2d 813 (1975). In *Hickey v. Green*, 14 Mass.App. 671, 442 N.E.2d 37 (1982), the Appeals Court noted that "the earlier Massachusetts decisions laid down somewhat strict requirements for an estoppel precluding the assertion of the Statute of Frauds," but looked to the Restatement (Second) of Contracts for a statement of the rule presently "applicable in most jurisdictions in the United States." *Id.* at 673, 442 N.E.2d 37 (applying the rule of Restatement (Second) of Contracts § 129, which is substantially similar to § 139(1), in a case involving a contract for the sale of real estate); *see Goeken v. Kay*, 751 F.2d 469, 472, 474 (1st Cir.1985) (quoting the Restatement § 139(1), and affirming a decision of the district court which

"assumed for the sake of argument" that Massachusetts law permitted recovery upon reasonable reliance on an oral promise, notwithstanding the statute of frauds).

The court in *Cellucci v. Sun Oil Co.*, *supra*, summarized the "essential factors giving rise to an estoppel":

(1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission.

2 Mass.App. at 728, 320 N.E.2d 919 (quoting *Industrial Bankers of Mass. Inc. v. Reid, Murdoch & Co.*, 297 Mass. 119, 124, 8 N.E.2d 19 (1937)) (citations omitted); *see Loranger Construction Corp. v. E.F. Hauserman Co.*, 6 Mass.App. 152, 154, 374 N.E.2d 306 (Keville, J.), *aff'd*, 376 Mass. 757, 384 N.E.2d 176 (1978).

■■■■■ Pahlavi points out that neither Palandjian's affidavits nor indeed the allegations in his complaint suggest fraud in the inducement or misrepresentation. This is not essential for estoppel to apply. "Recovery in these circumstances requires no more than a promise on which the promisee could reasonably have placed reliance; and attention is to be focused upon the reasonableness of that reliance." *Loranger Construction Corp. v. E.F. Hauserman Co.*, 6 Mass.App. 152, 159, 374 N.E.2d 306, *aff'd*, 376 Mass. 757, 761, 384 N.E.2d 176 (1978) (Braucher, J.) ("When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' . . . .").[1]

---

**1.** Pahlavi attempts to distinguish *Loranger* on the basis that it involved a "promissory estoppel" theory, a doctrine which typically applies where a court is asked to "create" a contract in the absence of consideration. *See* Restatement (Second) of Contracts § 90 (1981). Although the traditional "promissory estoppel" doctrine differs from the type of estoppel at issue here, the principles discussed in *Loranger* are nonetheless relevant to this case. *See Loranger*, 6 Mass.App. 152, 159, 374 N.E.2d 306 ("it is doubtful that the prohibitions of the Statute of Frauds

. . . are applicable where recovery is otherwise warranted on the basis of promissory estoppel") (dictum), affirmed without addressing this issue, 376 Mass. 757, 764, 384 N.E.2d 176 (1978).

If the equitable doctrine of estoppel was applied in this case, the remedy available to the plaintiff might be restricted, even though his action at law survived. *See* Restatement (Second) of Contracts §§ 90, 139 (1981) ("The remedy granted for breach may be limited as justice requires."); *see also Chedd-Angier Production*

Each of the factors necessary to show estoppel may be present in this case. Palandjian has submitted competent evidence indicating that Pahlavi made specific representations regarding the Kazar Shahr project which reasonably induced Palandjian to invest substantial time, money, and other resources toward development of the project. That evidence, if believed, is certainly sufficient to show that Palandjian changed his position to his substantial detriment. Whether the elements necessary to create an estoppel exist is an issue of fact. *Moran v. Town of Mashpee*, 17 Mass.App. 679, 681, 461 N.E.2d 1231 (1984);

*Danielczuk v. Ferioli*, 7 Mass.App. 914, 388 N.E.2d 724 (1979) ("The assertion of an estoppel raises factual questions of reliance and reasonableness that should have been left for resolution at trial."). The court is not in a position to decide at this stage of the case that estoppel cannot be shown.

For these reasons, the court rules that, upon this record, the statute of frauds does not bar Palandjian's contract claim.

---

Co. v. Omni Publications Int'l, Ltd., 756 F.2d 930, 937 (1st Cir.1985) ("Under § 90 of the Restatement (Second) of Contracts, adopted in its tentative form by the Massachusetts court in *Loranger*, damages available under promissory estoppel range from full contract damages to reliance or restitution damages."). Where recovery rests solely upon the justified reliance of the prom-

isee, without any suggestion of fraud, it would seem equitable that such recovery be measured by the extent of the reliance interest, i.e. restitution, rather than by conferring the benefit of the bargain. *See* Restatement (Second) of Contracts §§ 90 comment d, 139 comment d, 363 comment b (1981).