EDWARD BARRY & others *vs.* SIDNEY COVICH & others.

Suffolk.   November 4, 1954. — March 4, 1955.

Present:   QUA, C.J., RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

*Trust,* Constructive trust.   *Unincorporated Association.   Club.   Equity Pleading and Practice,* Parties, Costs.

A class suit in equity brought against purchasers of a golf course to enforce a constructive trust of the property in favor of numerous users of the course alleged to be members of an unincorporated "golf club" must be dismissed in the circumstances where the identities of the beneficiaries of such constructive trust were not established, even if the other elements thereof were present. [343]

On an appeal by the plaintiffs from the final decree in a suit in equity, with a full and complete report of the facts by the trial judge, where there was no reasonable necessity for the defendants' printing the evidence in a supplemental record under Rule 5 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 696, this court upon affirmance of the decree ordered that the expense of printing the evidence be not included in the defendants' costs. [345]

BILL IN EQUITY, filed in the Superior Court on November 9, 1953.

The suit was heard by *Goldberg,* J.

*Frank I. Rose,* for the plaintiffs.

*Edward O. Proctor,* (*Harold M. Linsky* with him,) for the defendants.

RONAN, J.   This is an appeal from a final decree dismissing a bill in equity brought by ten plaintiffs alleging that they are members of the Blue Hill Golf Club, a nonprofit, unincorporated association of approximately three hundred fifty members, that they comprise a group known as the activities committee of said club, and that they bring this suit in a representative capacity in behalf of themselves and the remaining members of said club to enforce a constructive trust against the defendants upon a certain parcel of land.

The judge made full and complete findings of fact and the defendants in accordance with Rule 5 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 696, have supplemented the record by a transcript of the evidence.

The Blue Hill Land Company, Inc., a corporation, hereinafter referred to as the land company, owned a parcel of about two hundred fifty-five acres of land in Canton upon which were located a golf course, a sand or gravel pit, and a tract of undeveloped land suitable for about twenty or more house lots.  The golf course contained about one half of the total acreage.  One Clauson owned almost one half of all the shares of the land company.  The Blue Hill Golf Club Company was wholly owned by the land company and was the operating company of the golf course.  Persons desiring to play golf on this course filed an application for membership, paid an initiation fee and annual dues to the golf company, and secured no interest in the golf company but only a license to play on the golf course and to use the facilities of the club house, and are hereinafter called playing members.  There were different classes of playing members paying annual dues at different rates.  There were but two lists of the playing members one of which was held by an employee of the golf company and the other by its printer.

Clauson in 1951 called a meeting of the playing members

and suggested the formation of a committee to regulate conduct on the golf course. Such a committee was subsequently formed, together with subcommittees, and through 1952 it conducted socials, dances, and golf tournaments, and formulated rules in using the golf course. A women's committee was formed in 1952. The playing members had no other officers than these committees. In the spring of 1953 a meeting of the playing members was called, and an employee of the golf company who had a list of these members gave them notice. At this meeting an activities committee of ten men (the plaintiffs) and a woman, who had been made chairman of the women's committee, was chosen. As a result of a vote taken at this meeting by-laws referred to as policies of the association were subsequently drafted and sent to the members.

One Gorney in the spring or summer of 1952 together with four or five others negotiated with the land company for the purchase of the property. The defendant Corkin, who was related to Gorney by marriage, examined the property with Gorney. The latter asked Corkin if he would be interested in buying the remainder of the land outside of the golf course. Corkin replied that that would leave twenty or more house lots worth about $1,000 a lot and the sand and gravel pit, the value of which he did not know, and advised Gorney not to purchase the property. Corkin at that time was not acting as Gorney's agent, was not employed by him, and received no confidential information from him. Gorney and his group in the summer of 1952 refused an offer of the land company to sell for $125,000.

Gorney in January, 1953, wrote Cappers, the treasurer of the golf company, stating that a number of the playing members had spoken to him (Gorney) about the possibility of purchasing the property for the membership and inquiring whether the land company would sell it for that purpose. Gorney together with one Weinberg, also a playing member, arranged for a meeting of the leaders of the various groups of playing members at Gorney's home on February 8, 1953. Sixteen playing members attended and one who

was not such a member who desired to join a membership owned club and who was well informed about golf courses. The defendant Covich, although a playing member but not invited, attended and participated in the discussion. Gorney presided and at the opening of the meeting stated that it was for the purpose of acquiring the premises of the land company for a membership owned golf club and that if anyone objected he should leave. No one left. Gorney requested that whatever happened at the meeting should be kept secret. Gorney set forth the advantages of this property and of a golf club owned by the members. He said the sand and gravel pit could first be sold, that the house lots could be sold for $30,000, that the entire parcel might be bought for $125,000, and that it could be definitely purchased for $150,000. He outlined a plan for obtaining the purchase price by which two hundred fifty members would each purchase a share for $500 or the money be secured by raising a mortgage or some of the members might advance the money. He suggested that, if the property could not be purchased for $125,000, negotiations be continued until after Labor Day when all the dues had been paid, and that an offer of $150,000 be made. A negotiating committee was selected and instructed to offer $115,000 and to go as high as $125,000 and after Labor Day, if the latter offer was not accepted, to go to $150,000. One Coleman told a group including Covich that Clauson had told him in strict confidence that, while he was asking $200,000 for the property, he would sell it for $150,000. Covich before he left the meeting told Gorney that he could not attend the next meeting but he would have his accountant, one Ferngold, represent him; and he told Gorney to try to purchase the property and said, "I'm with you whatever the members do." The negotiating committee made a report at a meeting held at Gorney's home on February 15, 1953, that Cappers, treasurer of the golf company, had rejected the offer of $115,000 and was asking $200,000. Ferngold attended this second meeting at Gorney's home at which about twenty members were present. At the opening of

this meeting Gorney warned everyone to "Keep everything as confidential as possible." At various times during the summer of 1953 Gorney and Coleman saw Clauson concerning the property but no meeting of the playing members was called prior to October 8, 1953.

Covich and Corkin agreed with the land company on August 11, 1953, to purchase the entire parcel through a straw, the defendant Parkway Homes, Inc., for $150,000, title to pass on December 31, 1953. Covich and Corkin were to buy the property as a joint venture. Covich then began to hold meetings with various playing members and offered to sell the golf course part of the land for $150,000. This offer was extended to October 22, 1953. A meeting of the entire membership of the playing members was called for October 8, 1953, at which one hundred fifty to two hundred attended, and a similar meeting was held on October 15, 1953. A committee was selected and prepared to offer this sum for the portion occupied by the golf course, but when this offer was made on October 23, 1953, to Corkin, he rejected the offer as he said it came too late.

The judge found that the whole parcel of land was worth more than $150,000; he also found that the persons attending the February meetings at Gorney's home did not plan, or intend, to buy the land for themselves, and ruled that no constructive trust should be imposed in their favor. He came to the same conclusion in reference to playing members who might now desire to buy the property.

A constructive trust may be said to be a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation or where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information. It is difficult to define the exact scope of this remedy because of the diversity and variety of the different forms which come within its sweep, and we do not attempt to do so here.

This equitable doctrine has frequently been employed, and our present tendency is to extend its availability not only where there has been a breach of a relationship long recognized as fiduciary but also where there has been the wrongful use of information confidentially given to one for a particular purpose and where instead it has been employed for an entirely different purpose to the gain of the one receiving the information and the detriment of the other. *Essex Trust Co.* v. *Enwright,* 214 Mass. 507. *H. C. Girard Co.* v. *Lamoureux,* 227 Mass. 277. *Horn Pond Ice Co.* v. *Pearson,* 267 Mass. 256. *Cann* v. *Barry,* 293 Mass. 313. *Berenson* v. *Nirenstein,* 326 Mass. 285. *Warsofsky* v. *Sherman,* 326 Mass. 290.

The difficulty, however, with the plaintiffs' case is to establish the identity of the individuals in whose favor a constructive trust can be imposed, even if we assume that all the other factors necessary to prove the existence of such a trust have been made out. The rights of the parties are to be determined at the time Covich and Corkin became the owners in the name of their straw, Parkway Homes, Inc. Scott on Trusts, §§ 462.4, 462.5. The persons who attended the meetings at Gorney's home on February 8 and 15, 1953, so far as appears, were a self appointed group interested in purchasing the premises so that the playing members should acquire a membership owned golf course. They had no authority to bind the playing members to join in any plan to purchase the land. Indeed, no definite plan had then been formulated for financing its purchase. It might be through the purchase of shares at $500 each by the members or others, or it might be by contributions from members, or it might be by a mortgage. The title if acquired might be taken in the name of a corporation, if one were to be formed, or in the name of trustees, if they were to be selected and their powers defined. A voluntary association is not a legal entity other than in cases where by statute it is given the right to sue or defend, and if we were dealing with an action at law it is plain that the plaintiffs alone would have no standing as parties plaintiff or defendant. *Hanley*

v. *American Railway Express Co.* 244 Mass. 248.   *Tyler* v. *Boot & Shoe Workers Union*, 285 Mass. 54.

The practice is well established in equity that a class suit may be brought by those who fairly represent the interests of the remaining members of the class, *Pickett* v. *Walsh*, 192 Mass. 572, *Donahue* v. *Kenney*, 327 Mass. 409; but only the members of an association organized for recreational purposes who participated in or authorized or ratified the action of those acting as their agents are entitled to enjoy the benefits or are subjected to liability for the acts of their agents.  *Sweetman* v. *Barrows*, 263 Mass. 349, 355.  *Malloy* v. *Carroll*, 287 Mass. 376, 392.   *Sullivan* v. *Barrows*, 303 Mass. 197, 204.   *New York, New Haven & Hartford Railroad* v. *Jenkins*, 331 Mass. 720, 734–735.   The playing members had no constitution or agreement by which their rights and duties were settled, compare *McFadden* v. *Murphy*, 149 Mass. 341, *Bacon* v. *Paradise*, 318 Mass. 649; and rules providing for an activities committee gave no authority to the plaintiffs as members of that committee to represent the entire membership in their attempt to purchase the property. Moreover, it is plain that the playing members attending the meetings at Gorney's home in February, 1953, were not acting for the entire membership, although one of the plans there advanced was to give preference to the playing members before admitting others to join in the purchase of the property.   Besides, the majority of the members had no knowledge of those meetings.   Neither were they represented at them.   It is also significant that when the membership meetings were held in October, 1953, the majority voted to purchase that part of the premises occupied by the golf course for $150,000.   No other collective action seems to have been taken by the playing members.   The purchase was never effected because the parties failed to agree as to how much land should be included and Corkin finally rejected the offer as having been made too late.

It follows that neither the activities committee nor the persons attending the February meetings can be found to be authorized to represent the entire membership of the playing

members and that the request to substitute or add the persons attending the meeting at Gorney's home or to join the remaining members who desire to join should be denied.

The defendants request that there be included in the taxable costs the expense of printing the transcript of the evidence. The judge made careful and complete findings of fact. There was no reasonable necessity for printing the transcript and we are unable to see what advantage thereby was derived by the defendants. We think that in accordance with said Rule 5 it would be a more appropriate exercise of discretion not to permit this item to be included in the taxable costs. The final decree is affirmed with costs of this appeal.

*So ordered.*