SUPERIOR GLASS CO., INC. *vs.* FIRST BRISTOL COUNTY
NATIONAL BANK & another[1]
(and a companion case[2]).

Bristol.   May 14, 1979. — September 20, 1979.

Present: GRANT, ARMSTRONG, & KASS, JJ.

*Contract,* Building contract. *Bond,* Construction contract bond. *Trust,*
Constructive trust.

In an action by two subcontractors seeking to recover from an owner
of property unpaid balances owed to them by a general contractor,
liability could not be imposed on the owner on the basis that it had
unilaterally and without notice to subcontractors waived the con-
tract requirement of a payment bond where the form of the bond
did not appear in the record, and, consequently, there was no basis
for a determination that the plaintiffs would have been entitled to
the benefit of the bond had it been obtained. [358-359]
In an action by two subcontractors seeking to recover from an owner
of property unpaid balances owed to them by a general contractor,
liability for the unpaid balances could not be imposed on the owner
on the basis that the owner requested and the subcontractors grant-
ed waivers of lien since the waivers had no legal effect under G. L.
c. 254, § 32. [359-360]
In an action by two subcontractors seeking to recover from an owner
of property unpaid balances owed to them by a general contractor,
the owner, a bank, breached its fiduciary duty to the subcontractors
by lulling them into assuming their creditor positions were protect-
ed even though it knew of the contractor's unstable financial condi-
tion and then arranging for its final construction advance to the
contractor to be endorsed back to the bank in satisfaction of a prior
loan even though it knew of the contractor's unpaid debts to the
subcontractors, and a constructive trust was therefore imposed
upon the bank for the funds it caused to be paid to its account by
the contractor. [360-363]

[1] C. A. Thomson Construction Co., Inc.

[2] M. F. Cash Corporation *vs.* First Bristol County National Bank &
another.

TWO CIVIL ACTIONS commenced in the First District Court of Bristol on August 5, 1975, and in the Superior Court on March 11, 1976, respectively.

Upon removal of the first action to the Superior Court, the cases were heard by *Sahady*, J., a District Court judge sitting under statutory authority.

*Marc E. Antine* for First Bristol County National Bank.

*Stephen D. Clapp* for the plaintiffs.

KASS, J. Two subcontractors seek (in consolidated actions) to recover from an owner of property unpaid balances owed to them by a general contractor on the ground that the owner acted in a fashion which led them to believe payment for their work was covered by a performance bond.

When the defendant First Bristol County National Bank (bank) embarked upon the construction of a branch facility in Seekonk, it invited bids from general contractors based on plans and specifications containing "General Requirements"[3] which, in turn, included a provision that the contractor who received the award must furnish a performance bond.[4] C. A. Thomson Construction Company, Inc. (contractor), won the award to build the job. Because the contractor was insufficiently credit worthy, it could not obtain a performance bond. Nevertheless, the bank elected to let the contractor continue the job, thus waiving the performance bond requirement. Superior Glass Co., Inc. (Superior), and M. F. Cash Corporation (Cash), the plaintiffs in these cases, were the glazing and paving subcontractors, respectively. The supplementary general conditions of the construction contract required the contractor to "see that all subcontractors read the

---

[3] The General Requirements were added to a set of American Institute of Architects General Conditions (AIA Document A 201 — Twelfth Edition — April [1970]).

[4] The language of the General Requirements left it arguable whether the performance bond was "requested" rather than "required." We agree with the trial judge that the bond was mandatory.

terms of the General Conditions [and] the Supplementary General Conditions." Officers of Superior and Cash testified that, indeed, they had read the General Conditions, including the General Requirements, and had relied upon the requirement that whoever was the general contractor would be bonded.

As the job proceeded and the branch bank building went up, the financial condition of the contractor went down. Prior to making its last construction advance (as owner) to the contractor, the bank had possession of a list of unpaid subcontractors and suppliers, among which were Superior, which was owed a balance of $2,424, and Cash, which was owed a balance of $4,951.30. On February 21, 1975, the bank made its last construction advance in the form of a cashier's check in the amount of $13,728.30, payable to the contractor. That check was simultaneously endorsed back to the bank to satisfy a debt of $12,500 which the contractor owed the bank. The balance of $1,228.30 was credited to the contractor's checking account at the bank.

We have drawn these facts from the findings of fact of the trial judge, which we accept unless clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *C.C. & T. Constr. Co.* v. *Coleman Bros., ante* 133, 135 (1979), and cases cited. On our examination of the testimony and exhibits, the judge's findings are amply supported. The judge entered judgment in the amount of $2,424 for Superior and $4,951.30 for Cash, plus interest and costs, and it is from these judgments that the bank has appealed.

1. We are invited by the plaintiffs, Superior and Cash, to decide that subcontractors are entitled to rely on, and hold an owner liable under, contract documents which contain a requirement for a payment bond in the event an owner unilaterally, and without notice to subcontractors, relieves the general contractor of the bond obligation. In the instant case, the form of the bond to be furnished, an American Institute of Architects form, does

not appear in the record and, consequently, there was, and is, no basis for any determination that the plaintiffs would have been entitled to the benefit of the bond had it been obtained. Contrast *Waite Hardware Co.* v. *Ardini & Pfau, Inc.*, 339 Mass. 634, 638 (1959), where the bond named the owner as the sole obligee, and *Morse Bros. Elec.* v. *Martin Shore Realty Co.*, 344 Mass. 81, 84-85 (1962), where the terms of the bond covered liens only. These cases call to attention that the decisions in Massachusetts have interpreted the range of obligees and beneficiaries of payment and performance bonds narrowly (*Waite* at 638) and that owners have no direct contractual relations with subcontractors and suppliers, even though the subcontractors might be bound by the general conditions in some circumstances (*Morse* at 85). For instances where a subcontractor has been able to claim against the bond see *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416 (1943); *Robinson Clay Prod. Co.* v. *Beacon Constr. Co.*, 339 Mass. 406, 408-410 (1959). But cf. *Philip Carey Mfg. Co.* v. *Peerless Cas. Co.*, 330 Mass. 319, 320-321 (1953).

2. It was open to the subcontractors to protect their interests by filing a notice of contract under G. L. c. 254, § 4, as amended through St. 1973, c. 801, § 2, at any time before completing work under the subcontract.[5] It is not surprising that they did not do so since the bank's architect, who supervised construction on its behalf and approved construction requisitions, asked (through the contractor) that the subcontractors supply releases of liens each time construction funds were paid to the contractor. The evidence received reflects that the bank was aware of, and encouraged this procedure.[6] Paired with

---

[5] On public construction jobs, the Legislature has exchanged the right of a subcontractor to acquire a lien for a requirement that the general contractor be bonded. G. L. c. 149, § 29. See *Manganaro Drywall, Inc.* v. *White Constr. Co.*, 372 Mass. 661, 663-664 (1977).

[6] Under the contract documents, the architect was the bank's representative on the construction job. His actions were, therefore, imputa-

the construction documents, Superior and Cash suggest the request for a lien waiver constituted a misrepresentation of the degree of assurance of payment of the subcontractors on the job. However, neither the bank's requesting, nor the subcontractors' granting the waivers of lien was of legal effect since G. L. c. 254, § 32, makes void and unenforceable a promise purporting to bar the filing of a notice of contract or the taking of any steps to enforce a lien. Only a person named as a principal on a lien bond may give an effective waiver of lien under G. L. c. 254, § 32. There is no support in the record for a conclusion that Superior and Cash thought they had the protection of a lien bond. Liability cannot be imposed on the bank solely on the basis of the request for a waiver of lien.

3. We consider next whether the bank had a fiduciary obligation to Superior and Cash at the time it paid its last construction requisition. By January, 1975, the bank, through its architect, had become well aware that the contractor had fallen behind in its obligations to subcontractors who had provided labor and materials on the Seekonk branch job. By February 15, 1975, this awareness became specific and quantified when the bank received from its architect a list of amounts due subcontractors, with invoices and letters attached. Six days later, the bank, not as lender, but as owner, issued a check for $13,728.30 to the contractor and simultaneously took the check back, with the contractor's endorsement to the bank on it, in order to discharge a loan owed by the contractor to the bank. By so doing, the bank crossed the line from action which was merely shabby to that which was legally actionable. In view of what the bank did on February 21, 1979, a constructive trust should be imposed on the last construction payment. A constructive trust is "a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the

---

ble to the bank, even had officers of the bank not been independently informed of the lien waiver procedure.

unjust enrichment of one party at the expense of the other where the legal title to the property [in the instant case the construction funds] was obtained by fraud or in violation of a fiduciary relation or where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information." *Barry* v. *Covich*, 332 Mass. 338, 342 (1955). In the *Covich* decision the court also said that its tendency was to extend the availability of this equitable doctrine "where there has been the wrongful use of information confidentially given to one for a particular purpose and where instead it has been employed for an entirely different purpose to the gain of the one receiving the information and the detriment of the other." *Id.* at 343. Here the fiduciary duty of the bank to Superior and Cash derives not so much from the confidential nature of the information it had obtained, but rather from the fact that the bank, by requiring the circulation of the general requirements, which included the bond requirement, to subcontractors, and by the waiver of lien request, lulled the subcontractors into assuming their creditor positions were protected. Knowing that, and knowing of the contractor's tender financial condition, the bank, which was receiving the benefit of the subcontractors' work, had a duty not to give itself a preference as a creditor, thus winding up with both the construction funds and the completed work. In these peculiar circumstances, we impose a constructive trust upon the bank for the funds it caused to be paid to its account by the contractor.

So, for example, in *Broomfield* v. *Kosow*, 349 Mass. 749, 755 (1965), the court observed that the catalyst in the change from business relationship to fiduciary relationship is the knowledge of one party of the other's reliance on him. Here the bank's actions served to promote that kind of dependency on the part of the subcontractors. "Equity will," the court said in *Broomfield*, "in sum, weigh whether unjust enrichment results from the relationship." *Id.* at 755. Compare *Warsofsky* v. *Sherman*, 326

Mass. 290 (1950), in which the element of the confidentiality of the information wrongfully employed by one party is the fulcrum of decision. Scholars and courts in other jurisdictions have attempted a more generalized definition of a constructive trust than that set forth in *Barry* v. *Covich, supra,* and *Coelho* v. *Coelho,* 2 Mass. App. Ct. 433, 435 (1974), i.e., unjust enrichment through fraud, abuse of fiduciary relationship, or misuse of confidential information. See 5 Scott, Trusts § 462, at 3413 (3d. ed. 1967); Bogert, Trusts and Trustees § 471 (2d ed. 1978); *Beatty* v. *Guggenheim Exploration Co.,* 225 N.Y. 380, 386 (1919) (in which Cardozo, J., wrote: "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee").

The fiduciary duty we find imposed upon the bank, as we have said, derives from the peculiar combination of circumstances in this case: the bank's actions, which could have led the subcontractors to think the job was bonded; the bank's status as owner rather than lender; the bank's knowledge of the contractor's weak financial condition; and its knowledge of the contractor's unpaid bills. The unjust enrichment occurred in its pocketing the construction funds, to which the plaintiffs' labor and materials had contributed, for its own benefit. We rehearse this combination of circumstances in order to emphasize what we do not say in this decision. We do not decide that a bank merely by reason of its status as construction lender has a fiduciary obligation to see to the proper application of construction advances. We do not say that an owner who pays a construction requisition has a fiduciary obligation to assure that the funds are properly applied to subcontractors on that owner's job. Primarily, subcontractors must rely for assurance of payment for their work on the provisions of G. L. c. 254. Only in those unusual instances where, as here, circumstances

combine to throw subcontractors off their guard and the author of those circumstances uses them to its advantage is there occasion for varying principles of more general application.

*Judgments affirmed.*