Garsh, J.
Summary judgment was granted in favor of the plaintiff, Boston Safe Deposit and Trust Company (“Boston Safe”), with respect to liability only on its claims against the defendant Ralph H. Seifert (“Seifert”) for breach of fiduciaiy duly and tortious non-disclosure. [5 Mass. L. Rptr. No. 1, 6 (April 8, 1996).] This court held that the undisputed facts demonstrated that Seifert had breached his fiduciary duty as trustee of the Bristol-Norfolk Development Trust (“BND Trust”), of which the Charles A. Wheeler Trust (“Wheeler Family Trust") was a beneficiary, and had engaged in tortious non-disclosure by negotiating and entering into an agreement to sell BND Trust properly solely for his own benefit without disclosing material facts to the Wheeler Family Trust. Boston Safe now petitions for assessment of damages. Seifert and Boston Safe disagree on the amount of damages to which Boston Safe is entitled, but they agree that there are no material disputed facts bearing upon the assessment of damages.
BACKGROUND
The following material facts are not disputed:[3]
In 1963 Seifert and Charles A. Wheeler (“Wheeler”) placed approximately eighty-five acres of undeveloped real estate in Foxboro and Mansfield into the BND Trust. By the terms of the trust instrument, Seifert and Wheeler served as co-trustees, and the net income of the trust was to be divided into two equal parts. Each trustee was to receive one-half of the trust’s net income during his lifetime. Upon Seifert’s death, one-half of the BND Trust net income was to be paid to a trust in favor of his family (“Seifert Family Trust”). Upon Wheeler’s death, one half of the BND Trust net income was to be paid to the Wheeler Family Trust. The BND Trust was to terminate on the death of both trustees, whereupon each of the Seifert and Wheeler Family Trusts would receive an undivided one-half interest in the trust corpus.
At or about the time of Wheeler’s death in June, 1977, there remained approximately seventy-eight acres of land in the trust corpus. Boston Safe succeeded Wheeler as co-trustee of the BND Trust, and, in 1986, it negotiated with Seifert to sell to him the Wheeler Family Trust’s one-half interest in the BND Trust property. Seifert simultaneously negotiated a purchase and sale agreement with real estate developer Paul J. Folkman (“Folkman”) to sell to Folkman substantially all of the BND Trust property. On November 20, 1986, the BND Trust was dissolved. On December 30, 1986, the Wheeler Family Trust conveyed its one-half interest (approximately thirty-nine acres) in the BND Trust to Seifert for $283,333.20. On the same day, and without Boston Safe’s knowledge, Seifert conveyed approximately 74.8 acres of the BND Trust property to Folkman for $1.2 million. Seifert retained 3.2 acres of the BND Trust property surrounding his Mansfield home. These acres were not conveyed to Folkman.
Seifert received $450,000 from Folkman at the time of the closing: the remainder was to be paid in four yearly installments with interest at the prime rate of the Bank of Boston plus one per cent per annum (the “Folkman Note”). Pursuant to the Folkman Note, Seifert received the following payments: December 30, 1987 — $249,500: December 30, 1988 — $245,436.73; January 4,1990 — $232,510.28. Seifertpaid$314,182 in federal and state capital gains taxes on the payments he received under the Folkman Note.
Under the terms of the Folkman Note, Folkman owed Seifert a final installment of $210,000 on December 30, 1990. Seifert did not receive this payment. Seifert entered, instead, in May of 1992, into a settlement agreement with Folkman and the Attleboro Pawtucket Savings Bank (“APS Bank”), with whom Folkman had entered into a joint venture to develop the former BND Trust property. The compromise called for Seifert to discharge the balance due on the Folkman Note; APS Bank, in turn, promised to pay Seifert $10,000 and to discharge a $100,000 personal loan Seifert had obtained from the bank in April of 1990. In addition, the Folkman joint venture agreed to release Seifert from a $35,000 obligation which it claimed Seifert personally owed to the joint venture and which Seifert disputed.
A portion of the proceeds of the Folkman Note is traceable to assets now held by Seifert. On April 11, 1988, Seifert applied to APS Bank for a loan in the amount of $135,000 to purchase real estate. Seifert used the Folkman Note as security for the loan. On May 25, 1988, Seifert executed a promissory note in the amount of $135,000. On May 27,1988, a warranty deed evidencing Seifert’s purchase of property in Birch Hill, North Conway, New Hampshire was recorded at *412 the Registry of Deeds. The deed was executed on May 24, 1988, and it shows a purchase price of $159,000. At the time of the purchase, Seifert had no outstanding mortgages on the property. On December 30, 1988, Seifert received $245,436.73 from Folkman. He paid the $135,000 he owed to APS Bank on the same day. The funds obtained by the loan secured by, and discharged with the proceeds of, the Folkman Note constituted eighty-four per cent of the purchase price of the New Hampshire property.
On April 26, 1990, Seifert obtained a loan from APS Bank in the amount of $100,000 for the stated purpose of “[i]nvest[ing] in New Hampshire real estate.” This loan was also secured by the Folkman Note. The loan proceeds were used to make improvements on the New Hampshire property.
On March 27, 1987, Seifert refinanced his Mansfield home with APS Bank. At that time, the three acres Seifert had retained were given to the bank as additional collateral for a $300,000 loan. Seifert instructed the bank to use $103,821.44 to pay off an outstanding mortgage on property located in Maine. The Mansfield mortgage was discharged on May 4, 1990.
This action was commenced on December 8, 1992. On December 6, 1993, Seifert transferred the retained three acres to the Ralph H. Seifert and Sandra C. Seifert Charitable Unitrust (“Charitable Unitrust”). At or about that time, the three acres were appraised for tax purposes as having a 1993 value of $100,000.[4]
DISCUSSION
The Wheeler Family Trust is entitled to be compensated fully for the consequences of Seifert’s tortious actions. This court has already found that Seifert did not make full disclosure of numerous material facts when he had duly to do so, that Boston Safe relied, to its detriment, on these non-disclosures, and, further, that Seifert acted for his personal benefit in violation of his fiduciary duties in negotiating and entering into an agreement with Folkman solely for his own benefit. Had the land been sold by the BND Trust to Folkman directly, the BND Trust would have received the funds from Folkman, and the beneficiaries of the BND Trust would have benefitted equally.
When a trustee commits a breach of trust, he is “accountable for any profit accruing to the trust through the breach of trust; or chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly administered.” Restatement (Third) of Trusts §205 (1992) (emphasis added). In other words, a beneficiary can choose to seek as damages either what was wrongfully taken or may seek the profit, if any, made by the wrongdoer with the improperly acquired trust property. A “trustee is subject to such liability as necessary to prevent the trustee from benefiting personally from the breach of trust.” Id. See also Restatement (Second) of Trusts §206 (1959).[5] The trustee is liable for “any profit which would have accrued to the trust estate if there had been no breach of [the] duty” of loyalty. Restatement (Second) of Trusts §206, comment a. Where “the breach of trust causes a loss ... the beneficiaries may surcharge the trustee for the amount necessary to compensate fully for the consequences of the breach.” Restatement (Third) of Trusts §205, comment a. To do that, it is appropriate to award interest on the funds of which the beneficiaries were deprived. Id.
A constructive trust is one means of making a breaching fiduciary accountable for any profits he may have obtained as a result of his breach. This mechanism is available if the properly acquired through the wrongful disposition of trust property is still held by the wrongdoer and can be traced. Alternatively, if the beneficiary is simply seeking to restore the dollar value of what was taken and not seeking what was gained by the wrongdoer, the beneficiary may enforce an equitable lien upon the product of the wrongful disposition of trust property that may still be held by the trustee and can be traced. ‘The persons interested in the trust estate have the option of taking the profits, or of taking interest.” Id. See also Restatement (Second) of Trusts §202. “A constructive trust may be said to be a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation . . .’’ Barry v. Covich, 332 Mass. 338, 342 (1955). It “arises when the duty to make restitution arises,” which is created at the moment title to property is wrongfully acquired. 5 Austin W. Scott & William F. Fratcher, The Law of Trusts §462.4 (4th ed. 1989). See also Loring: ATrustee’s Handbook, §3.3(3) at 23 (7th ed. rev., Charles E. Rounds, Jr. & Eric P. Hayes 1994) (“If a person comes into possession of property as a result of fraud, ... or some other such intentional wrong ... he will hold the property not for himself... but as a constructive trustee for the person who, but for the wrong, would have received the property”).
Boston Safe seeks both damages to restore what was taken and, in those instances where it has been able to trace the proceeds to property held by Seifert, it seeks a constructive trust in lieu of damages.
Cash Payments
Seifert’s breach of trust deprived the BND Trust of the opportunity to receive the moneys Folkman was willing to pay for the trust corpus. Because the beneficiaries had equal interests, Boston Safe is entitled to damages equivalent to half of each payment, after certain adjustments are made to the first payment.[6]
1. First Payment — December 30, 1986
On December 30, 1986, Seifert received $350,000 from Folkman as a down payment for the former BND Trust property. Seifert had previously received a $100,000 deposit from Folkman. Boston Safe is not *413 entitled to half of that $450,000 because there must be an adjustment reflecting the price Seifert paid the Wheeler Family Trust for its interest in the thirty-nine acres. However, the full purchase price Seifert paid the Wheeler Family Trust will not be credited against the initial payment from Folkman. To do so would result in Seifert’s being unjustly enriched.
The acreage sold to Seifert by the Wheeler Family Trust includes 3.2 acres retained by Seifert for his own use. There has been no finding that Seifert made any fraudulent non-disclosures with respect to this parcel.[7] Nevertheless, Seifert is not entitled to the land for nothing, which would be the effect if the entire sum of money received by the Wheeler Family Trust were to be deducted from the first Folkman payment. Part of the $283,333.20 received from Seifert, therefore, must be allocated to those 3.2 acres.
The 3.2 acres were appraised in 1993 for $100,000; it would be unreasonable to assume that the market value was the same in 1993 as in 1986. There is no earlier appraisal of these acres alone. It also would be unreasonable to derive, as Seifert suggested during oral argument, a per acre price for the 3.2 acres based upon the $283,333.20 Seifert paid for the thirty-nine acres since, as the sale to Folkman demonstrates, that amount did not reflect true market value. Instead, a per acre price will be derived based upon the 1986 arms-length, market-driven transaction with Folk-man. Dividing Folkman’s purchase price of $1.2 million by 75, the number of acres Folkman purchased, results in a per acre market value of $16,000. The 3.2 acres had a value, when purchased, of $51,200. Subtracting this amount from the $283,333.20 Seifert paid to the Wheeler Family Trust results in a credit to which Seifert is entitled of $232,133.20.
This credit will be applied to the first $450,000 payment Seifert received from Folkman. That leaves $217,866.80 in initial proceeds from the sale to Folk-man.[8] Boston Safe is entitled, as damages, to half that amount, namely $108,933.40.
2.Second Payment — December 30, 1987
On December 30, 1987, Seifert received $249,500 from Folkman. Boston Safe is entitled, as damages, to half that amount, namely $124,750.
3.Third Payment — December 30, 1988
On December 30, 1988, Seifert received $245,436.73 from Folkman. Instead of seeking damages equal to one-half of that payment— $122,718.36 — Boston Safe has elected an alternative remedy with respect to these proceeds. It has chosen to trace the proceeds to real estate that Seifert purchased using $135,000 of the $245,436.73 loan payment as well as some of his own money. Because Boston Safe is entitled to only one-half of the funds received from Folkman, the court rejects Boston Safe’s argument that all of its $122,718.36 should be deemed to have gone into the $135,000 used to purchase the real estate. Boston Safe is entitled, as damages, to half the amount remaining after the $135,000 is deducted from $245,436.73, namely $55,218.36. Boston Safe also is entitled to imposition of a constructive trust with respect to the property purchased with half of the $135,000. See infra.
4. Fourth Payment — January 4, 1990
On January 4, 1990, Seifert received $232,510.28 from Folkman. Boston Safe is entitled, as damages, to half that amount, namely $116,255.14.
5. Fifth Payment — December 30, 1990
A trustee must compensate the trust for any loss in value of trust property as a result of the breach. Restatement (Second) of Trusts §205, comment c. The final payment in the amount of $210,000 was due from Folkman on December 30, 1990. Seifert entered into an agreement in May, 1992, whereby Seifert agreed to discharge Folkman and his joint venture partner from any duty to pay the final installment under the Folk-man Note. In return, it was agreed that Seifert would receive cash and other benefits totaling $145,000. Boston Safe’s damages are not limited to whatever benefits were actually received by Seifert, as Seifert argues. Bowen v. Richardson, 133 Mass. 293, 296 (1882) (in case of loss, trustee must account for the principal and interest). The Wheeler Family Trust is entitled to recoup what it lost whether or not Seifert chose to enforce the terms of the note.[9] Thus, Boston Safe is entitled, as damages, to one half of $210,000 or $105,000.[10]
Interest as an Element of Damages
Seifert’s wrongful actions not only deprived the BND Trust of the proceeds of a substantially more profitable sale, but also deprived the BND Trust and one of its beneficiaries of the use of those proceeds prior to the commencement of this lawsuit. As part of the assessment of damages, therefore, Boston Safe is entitled to a reasonably prudent rate of return on the Folkman payments which the BND Trust did not receive. Id. See also Trustees of Dartmouth College v. Quincy, 321 Mass. 219, 227 (1954). “Interest is compensation fixed by law for the use of money or, alternatively, as damages for its detention.” Boston Children’s Heart Foundation, Inc. v. Nadal-Ginard, 73 F. 3d 429, 442 (1st Cir. 1996) (fiduciary of non-profit corporation liable for interest corporation would have earned on misappropriated funds). Because such interest “is awarded to ensure that a party is fully compensated for its injuries," the rate of interest must not provide a windfall to the plaintiff. Id. (court did not err in refusing to award statutory twelve per cent prejudgment interest rate and awarding instead market interest rate based on United States treasury bills). Boston Safe has met its burden of demonstrating that it was injured in an amount equivalent to the interest that would have been earned had Seifert not arrogated *414 to himself the opportunity to sell the BND Trust property to Folkman.[11]
1. Interest rate
Return rates are determined by application of the “prudent investor rule” requiring the exercise of care, skill and caution “with a view both to safely of the capital and to securing a reasonable return.” Restatement (Third) of Trusts §227, comment e. Both parties have argued for the application of various interest rates,[12] ranging from five per cent to over fourteen per cent, but neither party supported its argument with evidence that a particular investment strategy and rate of return was reasonably prudent. Boston Safe did present an affidavit stating that under its “official investment policy guidelines,” all trust funds must be invested at least fifty per cent in equity; most are invested at sixty per cent in equity, and some (depending on the client’s needs) are invested seventy per cent in equity, with the remainder in a fixed income fimd. The record contains no evidence of the needs, ages, or interests of the beneficiaries of the Wheeler Family Trust and no evidence that Boston Safe’s “official investment policy guidelines” dictating that all trust funds be invested at least fifty per cent in equity conforms with what a reasonably prudent investor would do, no matter the needs, ages, or interests of the beneficiaries and no matter the state of the economy. Furthermore, had the property been sold by the BND Trust to Folkman directly, funds would have gone into the BND Trust. The record does not indicate how these funds would have been invested by the BND Trust.
Seifert and Boston Safe agree that this court has wide discretion in determining the appropriate rate of interest on funds improperly secured by breach of fiduciary duty. The court rejects Seifert’s argument that the five per cent rate in the BND Trust instrument should be applied. That rate was intended to apply only to legitimate loans of trust corpus made to or for the benefit of the donors. On this record, I conclude that the appropriate rate of interest is the legal rate of interest, which is six per cent. G.L.c. 107, §3. An award of interest should not be so high as to result in a windfall to the plaintiff.
2. Compound interest
Compound interest is appropriately awarded where, as here, there is an element of fraud or personal gain by a trustee. “Compound interest sometimes is allowed to prevent a fiduciary who has acted dishonestly from acquiring unjust profit or gain and for the purpose of affording a just and equitable settlement.” Arnold v. Maxwell, 230 Mass. 441, 445 (1918) (citations omitted). See Boynton v. Dyer, 35 Mass. (18 Pick.) 1, 7 (1836) (”[I]f the trustee suffer the trust money to lie idle, he is chargeable with simple interest, but if he converts it to his own use or employ it in his own business or trade, he is liable for compound interest”); Forbes v. Ware, 172 Mass. 306, 310 (1899) (negligence, unlike fraud, does not warrant awarding compound interest). Whether to award compound interest is left to the discretion of the court. In exercising that discretion, a court should take into account the nature and degree of the misconduct and the circumstances of the case. Shulkin v. Shulkin, 301 Mass. 184, 195 (1938).
Seifert’s actions constituted egregious violations of his obligations as a fiduciary of the BND Trust. He failed to disclose material facts when he had a duty to do so, and he acted solely for his personal benefit in violation of his fiduciary duties in negotiating and entering into an agreement with Folkman. Seifert then used the proceeds of the Folkman Note for his own use, dissipating most of the funds. Accordingly, in order to make Wheeler Family Trust whole, the interest awarded on Boston Safe’s share of the proceeds under the Folkman Note will be compounded until the date of the filing of this action.[13]
Credit for Capital Gains Taxes
Seifert argues that he is entitled to a credit for the capital gains taxes he paid on the installments that he received under the Folkman Note. In so doing, Seifert assumes that the damages to be awarded to the plaintiff are measured by Seifert’s gain. They are not. The damages awarded are designed to make the Wheeler Family Trust whole as best as possible. Therefore, a credit for taxes Seifert paid is not warranted. Cf. USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 343-44 (1984) (where goal is to order the wrongdoing defendant to give up all gain, taxes are deductible).
Flynn v. Haddad, 25 Mass.App.Ct. 496 (1984), upon which Seifert relies, is distinguishable. In that case, the court allowed the defendant, who had recorded a deed in a bad faith attempt to take title to partnership property, to recover real estate taxes he paid on the property. These taxes were properly chargeable to the partnership, and the property was available to be made the subject of a constructive trust. The defendant’s “recording of the deed did not interfere with the benefits which flowed to the partnership” from any of the defendant’s advances, including payment of taxes. Id. at 506. The wrongdoer had discharged the partnership’s real estate tax liability. Unlike Flynn, Seifert’s activities most definitely interfered with the benefits to which the beneficiaries were entitled and the Wheeler Family Trust has not been benefitted by Seifert’s payment of his own capital gains taxes. The fact that he may have paid too much does not entitle Seifert to a credit because such a credit would deprive Boston Safe of full compensation for its damages.[14]
Constructive Trust
Boston Safe requests imposition of a constructive trust in its favor on a portion of the real estate owned by Seifert in North Conway, New Hampshire and in West Southport, Maine. See generally Restatement (Second) of Trusts §202(1). The constructive trust device permits a beneficiary to have the advantage of *415 any profit, including appreciation, which may arise from the improper disposition of trust property. This principle does not simply apply to property acquired immediately by the fiduciary’s wrongful act, which, in this case, would be the cash received from Folkman, but also when property is subsequently acquired through the disposition of property initially acquired. Restatement (Second) of Trusts §202(1), comment b. Thus, so long as Boston Safe can show that the real estate now held by Seifert was acquired with funds he wrongfully obtained from Folkman, Boston Safe is entitled to the imposition of a constructive trust.
When trust property has been mingled with the trustee’s personal properly, a constructive trust may be enforced on the mingled property “in such proportion as the trust property so mingled bears to the whole of the mingled property.” Id. at comment h. See also Mickelson v. Barnet, 390 Mass. 786, 790 (1984) (embezzler of investor’s funds would become “constructive trustee of the money and its traceable proceeds”); Sullivan v. Sullivan, 321 Mass. 156, 158 (1947) (refusing to trace money belonging to guardian’s ward into real estate because of the lack of proof as to “what proportion of the price of Sullivan’s title consisted of the plaintiffs money”).
1. New Hampshire property
Boston Safe has been able to trace the use made of some of the proceeds from the 1988 payment to Seifert’s purchase of property in New Hampshire. Seifert used some of those proceeds to discharge the loan he had obtained, secured by the Folkman Note, to purchase the New Hampshire property. The proceeds so applied totaled $135,000. Boston Safe is entitled to imposition of a constructive trust with respect to what was done with half of that sum, namely $67,500.[15] The Wheeler Family Trust’s portion of the Folkman proceeds used to purchase the New Hampshire property represents forty-two per cent of the $159,900 purchase price. Boston Safe is entitled to the imposition of a constructive trust in its favor on forty-two per cent of the New Hampshire property, regardless of its current value.[16]
2. Maine property
Boston Safe’s claim to a constructive trust on the Maine property is based upon the use of the three acres retained by Seifert and not sold to Folkman as collateral for a refinancing of property in Massachusetts already owned by Seifert. Boston Safe is not entitled to a constructive trust on the Maine property for several reasons. Boston Safe did not allege fraud in the procurement of the three acres and has secured no liability judgment to this effect. Thus, the retained acres were Seifert’s to pledge and the constructive trust principles simply do not apply.[17] Furthermore, the three acres were not used to purchase the Maine property, but merely as one piece of collateral for a $300,000 refinancing of Seifert’s Mansfield home, some proceeds of which were used to pay off a loan on Seifert’s Maine property. The three acres were not directly used to acquire equity in the Maine property. There is nothing in the record upon which proportional allocations could be calculated for the purposes of rendering an award. Finally, the Wheeler Family Trust was not injured by use of the three acres as collateral.[18] The three acres were never foreclosed and the collateral has been discharged.
Equitable Lien
In order to secure its damages, Boston Safe is entitled to an equitable lien on the New Hampshire property. A breaching fiduciary forfeits his share of trust property unless and until he makes good on the loss he caused the beneficiaries. Restatement (Second) of Trusts, §257 (“If a trustee who is also one of the beneficiaries commits a breach of trust, the other beneficiaries are entitled to a charge upon his beneficial interest to secure their claims against him for the breach of trust, unless the settlor manifested a different intention”). See also Belknap v. Belknap, 87 Mass. (5 Allen) 468, 471 (1862) (estate in the hands of the trustee should be used to discharge the legacies of other beneficiaries before the disloyal trustee “can claim any part of it, if the estate has been diminished by a violation of his duties as trustee”). Seifert has not yet made good on the losses he caused the Wheeler Family Trust.
The aggregate amount of the lien to which Boston Saféis entitled is $167,5000. Of that amount, $67,500 represents Seifert’s half of the proceeds of the Folkman Note used to purchase the New Hampshire property, and $100,000 represents the proceeds used to pay for improvements to the New Hampshire property. “Where the trustee wrongfully uses trust funds to pay for improvements upon property owned by the trustee individually, the beneficiary is entitled to an equitable lien upon the property . . .” Restatement (Second) of Trusts, §202(1), comment f.
ORDER
For the foregoing reasons, the court hereby ORDERS that judgment be entered in favor of Boston Safe Deposit and Trust Company, as Trustee of the Charles A. Wheeler Trust under a Declaration of Trust dated June 10,1968, against Ralph H. Seifert in the amount of:
(1) $108,933.40 plus interest compounded at the rate of six per cent from December 30, 1986, until December 8, 1992;
(2) $124,750 plus interest compounded at the rate of six per cent from December 30, 1987, until December 8, 1992;
(3) $55,218.36 plus interest compounded at the rate of six per cent from December 30, 1988, until December 8, 1992;
(4) $116,255.14 plus interest compounded at the rate of six per cent from January 4, 1990, until December 8, 1992;
*416 (5) $105,000 plus interest compounded at the rate of six per cent from December 30, 1990, until December 8, 1992; and
(6) interest from December 8, 1992, until judgment is entered at the statutory rate of twelve per cent on the aggregate amount of the damages awarded above plus costs.
It is further ORDERED that judgment be entered declaring that:
(1) Boston Safe Deposit and Trust Company, as Trustee of the Charles A. Wheeler Trust under a Declaration of Trust dated June 10, 1968, has an ownership interest in forty-two per cent of the Birch Hill, North Conway, New Hampshire properly deeded to Ralph H. Seifert and Sandra C. Seifert by warranty deed dated May 27, 1988, and Ralph H. Seifert is hereby ORDERED to hold title to that property as constructive trustee of such part for Boston Safe Deposit and Trust Company, as Trustee of the Charles A. Wheeler Trust under a Declaration of Trust dated June 10, 1968; and
(2) Boston Safe Deposit and Trust Company, as Trustee of the Charles A. Wheeler Trust under a Declaration of Trust dated June 10, 1968, has an equitable lien on the Birch Hill, North Conway, New Hampshire property in the amount of $167,500 until this judgment has been satisfied.

 Several of the background facts are discussed more fully in the Memorandum of Decision and Order on Parties’ Cross-Motions for Summary Judgment.

 Boston Safe has filed a separate suit alleging that the retained three acres were fraudulently conveyed to the Charitable Unitrust.

 Any sections from the Restatement (Second) of Trusts which are relied upon were not revised in the Restatement (Third) of Trusts, which deals only with prudent investor rule and related rules concerning the conduct of a trustee in the management of a trust.

 Prior to discovery in connection with the assessment, Boston Safe argued that it was entitled to a constructive trust with respect to all the proceeds of the Folkman Note. With few exceptions, however, after it received an accounting, Boston Safe has not been able to trace what was done with the proceeds subsequent to their receipt. A constructive trust can only be imposed on the proceeds themselves if they are still in Seifert’s hands or on properly still being held by Seifert that was acquired with the proceeds.

 The court rejects Boston Safe’s request that it be awarded, as an element of damages, the full value of the 3.2 acres at the time of its disposition to the Charitable Unitrust plus interest. The amended complaint does not allege any fraudulent non-disclosure or breach of fiduciary duty with respect to these acres.

 Seifert would have the court deduct the amount he paid from $225,000, namely half of the Folkman payment to which the Wheeler Family Trust was entitled. This would result in a $58,333.20 credit to Seifert. Seifert is not entitled to be so rewarded for his tortious activities in knowingly acquiring trust property for a price significantly lower than the price at which he had agreed to re-sell the property. The amount needed to make the plaintiff whole consists of all the funds Folkman was obligated to pay under the terms of the note minus the amount already paid by Seifert for the acreage sold to Folkman divided by two.

 The record does not demonstrate that Folkman lacked sufficient assets to make the final payment.

 The equitable lien to which Boston Safe is entitled, see infra at 17, does not reduce the amount of the damages to which Boston Safe otherwise is entitled because it is only security for the damages assessed.

 In Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837, 842 (1986), upon which Seifert relies, the court found no interest would be due on sums the use of which the plaintiff was not actually deprived. Here, by contrast, the interest is being awarded only on sums the use of which the BND Trust and the Wheeler Family Trust were deprived.

 The court rejects Seifert’s alternative argument that any award of pre-filing interest would be improper.

 Seifert does not dispute that Boston Safe is entitled to simple interest at the statutory rate of twelve per cent on its damages from the date of the commencement of the action to the date judgment is entered.

 The absurdity of Seifert’s position is evident when his theory of damages is applied to a cause of action for conversion. Applying Seifert’s theory of tax credit entitlement, a defendant who pays income taxes on funds he has wrongfully converted would be entitled to a credit for the income taxes so paid in an action for damages seeking the total amount of the funds converted.

 Boston Safe is not entitled to a constructive trust with respect to all the proceeds used in the purchase of the New Hampshire property because that would not constitute a proportional allocation. However, because Seifert should not be entitled to retain any of the traceable proceeds of the Folkman Note until Boston Safe has been made whole, Boston Safe is entitled to an equitable lien upon the property purchased with Seifert’s half of the $135,000. See infra at 17.

 imposition of a constructive trust does not duplicate any of the damages awarded to Boston Safe because the $135,000 was deducted from the December 30, 1988 payment made by Folkman before awarding Boston Safe damages equaling half of that payment.

 Boston Safe received payment for those three acres in 1986 as part of the $283,333.20 paid by Seifert to the Wheeler Family Trust and a sum representing the fair market value of those acres has been deducted from the $283,333.20 payment before applying it as a credit in Seifert’s favor.

 Boston Safe’s argument for a constructive trust over a portion of the Maine property rests entirely — and incorrectly — on a statement in Scott, The Law of Trusts, supra at §521.5. That treatise addresses a situation where a person wrongfully pledges assets not his own and the rightful owner of the assets cannot take them from the pledgee who is “in the position of abona fide purchaser.” Id. For example, a bank may foreclose on property used as collateral, leaving the rightful owner without recourse to regain that real estate. In such a situation, “the owner of the securities is entitled to the money thus borrowed by the wrongdoer or to its proceeds if they can be traced.” Id. Here, the retained three acres were neither foreclosed upon nor are they held today by the bank as collateral.