Lauriat, Peter M., J.
The plaintiff and counterclaim defendant, Fort Point Commercial Company, Inc. (“Hunneman”), commenced this action against Wayne Spiegel in an effort to obtain Spiegel’s cooperation with a corporate restructuring plan. A central issue to the case is which of two documents, the Shareholders *340 Agreement Components (“SAC”) or the “March Document”[1] controls Spiegel’s stake in Hunneman, and the effect of the applicable agreement on his equity share in the company. Hunneman asserted five claims in its Complaint against Spiegel.
Spiegel responded by asserting ten counterclaims. Against Pratt and Hunneman, he asserted claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), breach of fiduciary duty/freeze-out (Count III), misrepresentation (Count IV), and promissory estoppel (Count V). Against all of the counterclaim defendants, Spiegel asserted claims based on unjust enrichment (Count VI), conversion (Count VII), and constructive trust (Count VIII). He also requested an accounting (Count IX) and a declaratory judgment as to which document controls his equity interest (Count X). Hunneman, Fort Point Management & Development Corp., and Fort Point Appraisal Corp. (the “Fort Point entities”) have now moved for summary judgment on all counterclaims against them, and as to Count v. of the Complaint. Pratt has moved for summary judgment as to all counts against him. For the following reasons, the counterclaim defendants’ summary judgment motions are allowed in part and denied in part.
BACKGROUND
The relevant facts are taken from the record and viewed in the light most favorable to Spiegel, the non-moving party. See Attorney Gen. v. Bailey, 386 Mass. 367, 371 (1982). Hunneman is a leasing and brokerage firm specializing in commercial real estate. Pratt is the president and CEO of Hunneman and majority shareholder of the Fort Point entities. Spiegel was employed by Hunneman as a real estate broker for approximately twenty years. In 2001, Spiegel and Hunneman entered into the Shareholders Agreement Components (“SAC”). The SAC provided that Spiegel and two others would each receive ten percent of the equity stock interests in Hunneman. A fourth person would receive five percent of the outstanding stock, and Pratt would hold the remainder, sixty-five percent.
Section II of the SAC covers circumstances under which a shareholder might part ways with Hunneman. Section II.B. states that if a shareholder is dismissed “for cause,” his or her stock “will be deemed surrendered and cancelled without payment.” Section II.C. provides, in pertinent part:
Upon termination of the Shareholder’s working relationship with [Hunneman] other than for cause (including on account of death or permanent disability), or upon the Shareholder resigning from [Hunneman] after April 30,2003, the following shall occur: first, [Pratt] shall have the right, but not the obligation, to buy that Shareholder’s stock at a price equal to (i) two times book value (corporate net worth as set forth on [Hunneman’s] balance sheet at the close of [Hunneman’s] then last fiscal year) if the termination is during the two (2) years beginning May 1, 2003, or (ii) at three times the book value, if during the next two (2) years, or (iii) at four times the book value thereafter (the “Formula Price”); and, if termination of the Shareholder’s working relationship occurs after May 1, 2006, and the Shareholder has then continuously been a full-time [Hunneman] broker, if [Pratt] does not elect to purchase that Shareholder’s stock the Shareholder may, within thirty (30) days after termination, elect to sell his/her shares to [Hunneman], and [Hunne-man] shall then be obligated to purchase his/her shares at the Formula Price determined as of the date of that person’s election to sell.
In Section VI.A., “Application of Cash Flow,” the SAC provided: “It is intended that [Hunneman’s] profits be built to enable [Hunneman’s] cash flow to be paid and applied in ... an amount equal to 10% of the balance for a special distribution to James, Spiegel and Minnerly [to the exclusion of other minoriiy shareholders] . . .”
Another document, entitled “Hunneman Commercial Company Corporate Organization Structure Year 2001" (“Structure Agreement”), and signed by Spiegel, provided that Pratt would receive an annual salary of $175,000 for three years, but it did not address Pratt’s compensation beyond April 30, 2004.
In 2007, the Hunneman shareholders entered into negotiations to restructure the corporation. On March 12,2008, the shareholders met on Hunneman’s premises. All of the minority shareholders were present. According to the counterclaim defendants, the March 12, 2008 meeting resulted in a document titled “Agreement” (the “March Document”) which was circulated on March 16, 2008 and eventually signed by all shareholders other than Spiegel. Spiegel disputes this and contends that the shareholders could not come to a final agreement at the meeting; that they did not reduce anything to writing; and that the resulting March Document contained material provisions that were not discussed at the meeting. Pursuant to the March Document, Spiegel’s equity interest would be reduced from ten percent[2] to three percent, in exchange for $40,000. Other shareholders, whose equity shares would increase by virtue of the Document, would also receive $40,000.
Section 7(C) of the March Document attempted to cover the potential situation of a single shareholder refusing to agree to the Document’s terms:
In the event that one or more of the parties refuses to document the agreements and understandings previously reached by signing this Agreement, Pratt, in his capacity as CEO of the Company, may determine to proceed with this Agreement provided at least a majority in number of Stockholders have then signed this Agreement, in which event the Company may proceed to enforce the understandings previously reached and/or the terms of prior instruments entitling rescission and or recall of *341 shares or rights to receive shares of the Company previously granted.
Spiegel resigned from Hunneman on April 18, 2008. He did not object in writing to the terms of the March Document before resigning. In a letter dated May 16, 2008, Spiegel demanded that his shares be redeemed pursuant to Section II.C. of the SAC, which he claims entitles him to four times the book value of his shares. In the May 16, 2008, letter, Spiegel, through counsel, asserted that “[t]here is no question that the stated book value for the company is artificially low for a number of reasons, including but not limited to the failure to secure the outright ownership of the ‘Hunneman’ name, despite the allocation of a $250,000 expense charged to the Company by [Pratt] in the form of a note for that stated purpose as well as other questionable corporate allocations which were improperly assessed to the Company.”
The parties disagree about Hunneman’s book value in the fiscal year ending December 31, 2007. Hunne-man argues that the book value was $966,743. Spie-gel, through his expert, Matthew G. Medlin, contends that the book value was actually $4,075,660. Medlin stated in his report that he had identified accounting entries and payments between May 1, 2001 and December 31, 2007 that decreased the book value of Hunneman and that should be added to the book value in order to calculate the Formula Price. In his deposition, Spiegel admitted that between May 1,2001 and April 2008, he received multiple monetary distributions from Hunneman in the form of bonuses. Spiegel maintains that while the bonuses contributed to lowering the book value, other events caused it to become “artificially low.”
Between May 2001 and April 2008, Spiegel received Hunneman’s Balance Sheet, Income Statement, and Operating Budget on at least an annual basis. Spiegel contends that Hunneman did not provide him with all relevant financial statements and budget documents. The counterclaim defendants assert that payroll allocations were among the information in the documents Spiegel received, but Spiegel maintains that he only saw such allocations after the shareholders began to negotiate a restructuring of the company. Spiegel does admit that between 2004 and 2008, he was aware that a large portion of Pratt’s salary was allocated to Hunneman.
The parties offer conflicting interpretations of the following testimony from Spiegel’s deposition:
Q: Do you feel that you were forced out of the company?
A [Spiegel]: Yeah. In my opinion, I felt that the [March Document]. . . basically said my way or the highway.
Q: Did anybody ever tell you that if you didn’t sign [the March Document], you’d be fired?
A [Spiegel]: You know, I don’t know when David Ross said this, but he said, “If you start looking under the hood, or if you contest [Pratt], he’ll fire you, he’ll shut down the company. You don’t know what you’re dealing with.”
The parties also offer differing interpretations of another sequence of deposition testimony:
Q: So it was your decision and your decision alone to resign?
A [Spiegel]: I felt I had no choice.
Q: Nobody within the company asked you to resign?
A [Spiegel]: No.
Q: And you weren’t fired?
A [Spiegel]: No. I don’t believe so.
The counterclaim defendants maintain that these statements amount to admissions by Spiegel that he was not the subject of coercion or intimidation, while Spiegel argues that the testimony “directly evidences” that he felt coerced, intimidated, or otherwise forced to resign.
DISCUSSION
Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). When appropriate, summary judgment may be granted against the moving party. Id.; Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on each relevant issue and that the summary judgment record shows the party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Comm’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 710 (1991).
“If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact[.]” Pederson, 404 Mass. at 17. The nonmoving party cannot defeat summary judgment by resting on its pleadings or mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). In considering a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The court views the evidence in the light most favorable to the nonmoving party. Beal *342 v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995).
I. Allegedly Derivative Nature of Counts I, II, III, VI, VII, VIII, and IX A.Background
The counterclaim defendants raise a major issue that bears on the resolution of a number of counterclaims. They assert that several of Spiegel’s claims must be dismissed because they should have been brought as a derivative action. Massachusetts’ “universal demand” statute requires all derivative actions to be preceded by a written demand upon the corporation that action be taken. G.L.c. 156D, §7.42. Spie-gel did not send a demand letter to Hunneman’s board of directors prior to asserting his counterclaims. Pratt argues that Counts III, VI, VII, VIII, and IX cannot survive summary judgment because they seek damages based on alleged misallocations of corporate funds that artificially reduced Hunneman’s book value, and that these claims are derivative in nature. He also argues that insofar as Counts I and II seek damages based on what Spiegel contends is Hunneman’s true book value, they must fail for the same reason. Hunneman and the other Fort Point entities join in Pratt’s argument.[3] As Spiegel points out, the “derivative” argument is limited in scope. It applies to the counterclaims only insofar as they relate to Spiegel’s allegations of improper cost allocations and their effect on Hunneman’s book value.
“It is a basic principle of corporate law that if a majority stockholder receives corporate cash distributions and a salary in excess of the reasonable value of services rendered, the right to recover the overpay-ments belongs to the corporation.” Bessette v. Bessette, 385 Mass. 806, 809 (1982). However, “the rule of corporate recovery for wrongs to the corporation is not as inflexible as [the counterclaim defendants] portray.” Orsi v. Sunshine Art Studios, Inc., 874 F.Sup. 471, 474 (D.Mass. 1995), citing Samia v. Central Oil Co., 339 Mass. 101, 123 (1959). “Remedies should be tailored to the facts of each case,” and “the court may fashion a remedy designed to put [Spiegel] as nearly as possible in the same position that he... would have occupied had there been no wrongdoing.” Id. at 475.
B.Count III
The parties agree that Hunneman is a close corporation. A close corporation is defined by three characteristics: “(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation.” Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 586 (1975). While a close corporation “provides an opportunity for the majority stockholders to oppress or disadvantage minority stockholders,” id. at 588, being a close corporation is not enough, by itself, to allow Spiegel to circumvent the usual derivative suit procedure. See, e.g., Bessette, 385 Mass. at 809-10 (holding derivative suit was correct course under the circumstances because minority stockholder showed only a breach of fiduciary duty owed to the corporation and not to him as an individual).
By its very nature, a corporate freeze-out claim alleges harm to the minority shareholder as an individual rather than harm to the corporation. See generally Donahue, 367 Mass. at 579 (treating freeze-out claim by minority shareholder as a direct action). Spiegel’s freeze-out claim is based in part on the fact that were he to have signed the March Document, as he felt he was being compelled to do, his equity share in the corporation would have been reduced from ten percent to three percent. At the same time, two other shareholders would have seen their equity interests increase dramatically while receiving the same monetary benefit as Spiegel. This illustrates the personal nature of his claim. For these reasons, Pratt and Hunneman’s motions for summary judgment are denied as to Count III, with respect to the issue of its derivative nature.
C.Counts VI, VIII, and IX
Spiegel’s freeze-out theory is at the heart of several of his other counterclaims. See Horizon House-Microwave, Inc. v. Bazzy, 21 Mass.App.Ct. 190, 196 (1985) (“To the degree that the gravamen of [the plaintiffs] action was abuse of fiduciary duty by a majority stockholder,” a derivative action was not required and the direct action could proceed). Spiegel’s claims for unjust enrichment (Count VI), constructive trust (Count VIII), and accounting (Count IX) are connected to his claim that he was frozen out of the corporation by Pratt’s improper actions. See Orsi, 874 F.Sup. at 475 (denying summary judgment on freeze-out claim alleging diversion of corporate assets). For example, his unjust enrichment and conversion claims may be impacted if he can show that were it not for Pratt’s actions, he would have been entitled to a special distribution under SAC Section VI.A. For these reasons, the motions for summary judgment are denied as to the issue of the derivative nature of Counts VI, VIII, and IX.
D.Counts I, II, and VII
If Spiegel can establish liability on the merits of his breach of contract claim (Count I), the just result may well be to permit direct relief as to that count, as well as to the claims for breach of the covenant of good faith and fair dealing (Count II) and conversion (Count VII). Spiegel’s recovery on those claims could depend on a calculation of his equity interest based on Hunneman’s true value, which in turn depends on resolution of whether Pratt overpaid his own salary or improperly allocated funds. See, e.g., Lapidus v. Hecht, 232 F.3d 679, 683 (9th Cir. 2000) (applying Massachusetts law) (holding claim alleging denial of stockholder voting rights could proceed directly because it was based on an alleged contractual right). See generally BioMetics v. Stocker, 2007 Mass.Super. LEXIS 304 *343 (Mass.Super. 2007) (permitting several claims by close corporation shareholder to proceed directly on theory that other shareholder diverted a patent from the corporation). For these reasons, summary judgment is denied with respect to the derivative issue in Counts I, II, and VII.
II. Spiegel’s Counterclaims A. Breach of Contract (Count I)
Spiegel alleges that the counterclaim defendants violated the SAC by refusing to redeem his equity interest consistent with his interpretation of SAC Section II.C.[4] Whether Pratt and Hunneman are entitled to summary judgment based on their failure to redeem Spiegel’s equity interest in the manner Spiegel suggests turns on (1) the meaning of the disputed SAC provision, and (2) whether Spiegel resigned from Hunneman or was constructively terminated without cause.
1. Interpretation of Section II.C.
The disputed portion of section II.C. reads:
Upon termination of the Shareholder’s working relationship with [Hunneman] other than for cause (including on account of death or permanent disability), or upon the Shareholder resigning from [Hunneman] after April 30,2003, the following shall occur: first, [Pratt] shall have the right, but not the obligation, to buy that Shareholder’s stock . . . ; and, if termination of the Shareholder’s working relationship occurs after May 1, 2006, and the Shareholder has then continuously been a full-time [Hunneman] broker, if [Pratt] does not elect to purchase that Shareholder’s stock the Shareholder may, within thirty (30) days after termination, elect to sell his/her shares to [Hunneman], and [Hunne-man] shall then be obligated to purchase his/her shares at the Formula Price determined as of the date of that person’s election to sell.
The parties agree that based on the first clause, if a shareholder resigned or was terminated other than for cause, Pratt had the right, but not the obligation, to purchase the shareholder’s stock. Pratt and Hunne-man argue that based on the second clause, if Pratt chose not to exercise his option to purchase the shares, Hunneman was obligated to purchase the shares if the shareholder was terminated without cause. They argue that no such obligation would arise if the shareholder resigned because the second clause only refers to “termination of the Shareholder’s working relationship,” whereas the first clause addresses termination without cause and resignation separately.
Spiegel offers a different interpretation of II.C. He contends that if Pratt declines to purchase a shareholder’s stock after termination without cause or resignation, then Hunneman is obligated to purchase the shares regardless of whether the shareholder was terminated without cause or resigned. He argues that in this context, the phrase “termination of the Shareholder’s working relationship" refers to both termination without cause and resignation. Spiegel argues that the absence of the words “or resigned” in the second clause is immaterial because the purpose of II.C. is to delineate the rights of shareholders who leave the company for a reason other than termination for cause, and because the words “other than for cause” are also absent from the second clause. In the alternative, he contends that II.C. is ambiguous and disputed facts remain regarding its meaning.
The interpretation of II.C. advanced by Hunneman and Pratt is correct as a matter of law. See Lexington Ins. Co. v. All Regions Chem. Labs., Inc., 419 Mass. 712, 713 (1995) (“The interpretation of a written contract or lease is a question of law, not fact”). Section II.C. unambiguously distinguishes between Pratt’s option to purchase the shares under one set of circumstances, and Hunneman’s obligation to do so under another. “A contract should be construed in such a way that no word or phrase is made meaningless by interpreting another word or phrase, because the interpretation should favor a valid and enforceable contract or lease rather than one of no force and effect.” Id. Moreover, the omission of a scenario involving resignation from the second clause must be presumed to have been intentional. See Chatham Pharm., Inc. v. Angier Chem. Co., Inc., 347 Mass. 208, 211 (1964) (holding, in the context of assignments, that where there is a provision regarding one party’s rights and obligations, the omission of another party’s rights and obligations is presumed to be intentional).
Given that Pratt chose not to exercise his option to purchase Spiegel’s shares, he has no remaining obligations under II.C. For that reason, Pratt’s motion for summary judgment is allowed as to Count -1 of the Counterclaim.
2. Nature of Spiegel’s Departure
Hunneman and Spiegel agree that Spiegel was not terminated for cause, but they disagree as to whether he voluntarily resigned or was constructively discharged without cause. If he was constructively discharged without cause, then under the second clause of II.C., Hunneman has an obligation to purchase his shares for four times Hunneman’s book value. Whether Spiegel was constructively discharged by virtue of a freeze-out remains undecided, see Count III, infra, so genuine factual issues remain regarding Hunneman’s obligation under II.C. For these reasons, Hunneman’s motion for summary judgment is denied as to Count I of the Counterclaim.
B. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)
Every contract formed in Massachusetts is subject to an implied covenant of good faith and fair dealing. Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991). The covenant ensures that “neither party shall do anything that will have the effect of *344 destroying or injuring the right of the other party to receive the fruits of the contract . . .” Id. at 471-72 (internal quotations omitted). There can be no claim for breach of an implied covenant of good faith and fair dealing when there is no breach of the underlying agreement. Young v. Freeman, 2009 Mass.Super. LEXIS 336, *12 (Mass.Super. 2009). “The requirement of good faith and fair dealing! ] ultimately is circumscribed by the obligations actually contained in the agreement.” Id., citing Accusoft Corp. v. Palo, 237 F.3d 31 (1st Cir. 2001).
Spiegel alleges that Hunneman and Pratt breached the implied covenant of good faith and fair dealing by breaching Section II.C. of the SAC. As discussed with respect to Count I, supra, Pratt has no remaining obligations under II.C., but genuine issues of material fact remain as to whether Hunneman breached that provision. For this reason, as to Count II, summary judgment is allowed in favor of Pratt and denied with respect to Hunneman.
C. Breach of Fiduciary Duty (Count III)
As discussed in Part I, supra, Hunneman is a close corporation. “Stockholders in a close corporation owe one another ... a duty of utmost good faith and loyalty.” Brodie v. Jordan, 447 Mass. 866, 869 (2006) (internal quotations omitted). Spiegel alleges that Pratt breached the duties of utmost good faith and loyally, which he owed to Spiegel, by (1) “freezing-out” Spiegel and (2) by refusing to honor the SAC as Spiegel interprets it.
1. Freeze-Out
“Majority shareholders in a close corporation violate th[e] duty [of utmost good faith and loyalty] when they act to ‘freeze out’ the minority.” Brodie, 447 Mass. at 869. While freeze-outs may take many forms,[5] “what [they] have in common is that, in each, the majority frustrates the minority’s reasonable expectation of benefit from their ownership of shares.” Id. The counterclaim defendants argue that Spiegel has admitted that he voluntarily resigned. Interestingly, the parties draw opposite conclusions from the same portion of Spiegel’s deposition testimony. When deposed, Spiegel testified that he “felt [he] had no choice” but to resign, and in effect, that he believed he would be terminated if he chose not to sign the March Document. The veiy statement that he believed he “had no choice” but to resign undermines the counterclaim defendants’ assertion that his resignation was voluntary. That statement, coupled with the other deposition testimony excerpted in the Background section, supra, demonstrates the existence of disputed factual issues. For this reason, Pratt’s and Hunneman’s motions for summary judgment are denied as to so much of Count III as allege a freeze-out of Spiegel.
2. Breach of SAC Section II.C.
Spiegel further alleges that Hunneman and Pratt breached the fiduciary duty they owe him by virtue of breaching the SAC Section II.C. “Where a director’s contested action falls entirely within the scope of a contract between the director and the shareholders, it is not subject to question under fiduciary duty principles.” Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007) (internal citations omitted). As determined with respect to Count I, supra, the counterclaim defendants’ interpretation of II.C. is correct as a matter of law. Because Pratt’s actions were consistent with II.C., see Count I, supra, his motion for summary judgment is allowed as to so much of Count III as asserts a breach of the SAC.
Whether Hunneman acted consistently with II. C. turns on whether Spiegel was terminated without cause or whether he resigned. If Spiegel was constructively terminated without cause, then he is entitled to redemption by Hunneman of his equity shares at the Formula Price. If he resigned, then Hunneman is not obligated to purchase his shares. Thus, whether Spie-gel can prevail on Count III based on a breach of SAC Section II.C. depends on the resolution of factual issues that remain in dispute. For this reason, Hunneman’s motion for summary judgment is denied as to Count III of the Counterclaim insofar as it alleges a breach of SAC section II.C.
D. Misrepresentation (Count IV)
“To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiffs detriment.” Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991), citing Powell v. Rasmussen, 355 Mass. 117, 118-19 (1969). The counterclaim defendants argue that Spiegel did not plead his misrepresentation claim with sufficient particularity. See Charbonnier v. Amico, 367 Mass. 146, 152 (1975) (“In all averments of fraud . . . the circumstances . . . shall be stated with particularity”); Mass.R.Civ.P. 9(b). Spiegel argues that he has made sufficient allegations to satisfy all elements of a misrepresentation claim, and that disputed factual issues remain. Specifically, he contends that between 2005 and 2007, the counterclaim defendants misrepresented Hunneman’s book value and withheld financial records; that by such misrepresentations, the counterclaim defendants intended to induce him to forfeit his equity interest and resign; and that they have denied Spiegel the true and full value of his stock.
Disputed issues of fact remain as to Hunneman’s true book value and whether Pratt and Fort Point misrepresented it with the intent to deceive Spiegel. Spiegel has consistently alleged that Hunneman and Pratt overpaid Pratt’s salary and that they made improper allocations to the other Fort Point entities. *345 These allegations are sufficient to survive summary judgment. For this reason, the motions for summary judgment are denied with respect to Count IV of the Counterclaim.
E. Promissory Estoppel (Count V)
Spiegel states in his memorandum of law that he intends to pursue his promissory estoppel counterclaim only if the court concludes that the SAC is unenforceable. Where an enforceable contract exists, a claim for promissory estoppel will not lie. See Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass.App.Ct. 582, 594 n.33 (2007), citing Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 763 (1978). Because this court has determined that SAC is enforceable, see Count I, supra, summary judgment is allowed as to Count v. of the Counterclaim.
F. Unjust Enrichment (Count VI)
A successful claim for unjust enrichment involves three elements: “(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.” Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009). Spiegel does not address Count VI in his memorandum of law.
To the extent Spiegel’s unjust enrichment claim refers to Pratt’s alleged obligation to purchase Spiegel’s shares under SAC Section II.C., it cannot succeed because he had no such obligation. For this reason, Pratt’s motion for summary judgment is allowed as to Count VI as it relates to II.C. To the extent that it refers to Hunneman’s alleged obligation to purchase Spiegel’s shares under II.C., disputed facts remain as to whether that obligation exists, depending upon resolution of Spiegel’s freeze-out claim. See Counts I and III, supra. For this reason, Hunneman’s motion for summary judgment as to Count VI is denied with respect to Section II.C.
To the extent that the unjust enrichment claim refers to Spiegel’s allegations that Pratt misallocated Hunneman’s corporate funds and overpaid his own salary, and that, as a result, the counterclaim defendants were enriched, disputed issues of fact remain, so all parties’ summary judgment motions must be denied as to that issue.
G.Conversion (Count VII)
Spiegel alleges that the counterclaim defendants converted his equity interest in Hunneman by making improper allocations to other Fort Point entities. “The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment." In re Hilson, 448 Mass. 603, 611 (2007) (internal citations omitted). “There is no requirement that the one converting property must be shown to have had the intent to deprive permanently the rightful owner of its use and enjoyment, as in stealing.” Id.
Insofar as Count VII refers to the counterclaim defendants’ conversion of Spiegel’s property by refusing to honor SAC Section II.C., summary judgment is allowed as to Pratt and the Fort Point entities other than Hunneman, and denied as to Hunneman. See Count I, supra.
Insofar as Count VII refers to Hunneman’s transfer of funds to the other Fort Point entities, disputed facts remain as to Hunneman’s true book value. If such actions led to a decrease in Spiegel’s equity interest, then his conversion claim may succeed. For this reason, summary judgment is denied as to Count VII of the Counterclaim.
H.Constructive Trust (Count VIII)
Spiegel seeks a constructive trust on “any and all funds or other consideration obtained by, distributed to, or allocated for the benefit of the counterclaim defendants in violation of the SAC.” “A constructive trust may be said to be a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciaiy relation or where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information.” Mass. Wholesalers of Malt Beverages, Inc. v. Attorney Gen., 409 Mass. 336, 342 (1991), citing Barry v. Covich, 332 Mass. 338, 342 (1955).
A constructive trust shall not be imposed absent fraud, breach of a fiduciaiy duty or other misconduct. Collins v. Guggenheim, 417 Mass. 615, 618 (1994), citing Barry, 332 Mass. at 442. Disputed factual questions remain regarding whether the counterclaim defendants breached a fiduciary duty they owed to Spiegel by freezing him out of the corporation, and whether they may be liable for misrepresentation and unjust enrichment. See Counts III, IV, and VI, supra. A constructive trust may be imposed in relation to any of those counterclaims. For this reason, the motions for summary judgment are denied as to Count VIII of the Counterclaim.
I.Request for Accounting (Count IX)
Spiegel seeks an accounting of “the expenses, profits, assets and liabilities earned, incurred or owned by [Hunneman] as well as an accounting of the Corporate Allocations made concerning [Hunne-man] or [the other Fort Point entities].” The counterclaim defendants argue that Count IX is now moot because they have provided Spiegel with *346 Hunneman’s financial documents. “An agent or fiduciary is under a duty to keep and render accounts and, when called upon for an accounting, has the burden of proving that he properly disposed of funds which he is shown to have received for his principal or trust.” Samia, 339 Mass. at 126. “Under Massachusetts law, an equitable accounting is available only if there exists a fiduciary or trust relationship between the parties . . .” Chedd-Angier Prod. Co. v. Omni Publ’ns Int’l, Ltd., 756 F.2d 930, 937 (1st Cir. 1985). As established with respect to Count III, supra, Spiegel has a fiduciary relationship with Pratt. He does not have a fiduciary relationship with Fort Point Management and Development Corporation or with Fort Point Appraisal Corporation, so summary judgment is allowed in favor of those parties. Disputed factual issues remain as to certain financial transactions in which Spiegel alleges Pratt engaged, particularly regarding the size of Pratt’s salary and loans made to Hunneman’s affiliates. For these reasons, summary judgment is denied as to Count IX with respect to Hunneman and Pratt.
J. Declaratory Judgment (Count X)
Spiegel seeks a declaratory judgment that the March Document is unenforceable and the SAC controls the issue of redemption of his equity interest. The counterclaim defendants now seek summary judgment as to this count. Spiegel cannot be bound by the March Document because he did not sign it and never manifested an intent to be bound by its terms. See, e.g., Salem Laundry Co. v. New England Teamsters and Trucking Ind. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987) (“Parties do not become contractually bound until they mutually assent to bind themselves to an agreement”). “Wh[ere], as here, parties negotiate orally as to the terms of an agreement while intending to execute a written contract, the parties generally are not bound until the contract is signed.” Novel Ironworks, Inc. v. Werner Const. Co., Inc., 26 Mass.App.Ct. 401, 407-08 (1988). This conclusion is not altered by the March Document’s provision purporting to bind any shareholder who did not sign the document.
The March Document is unenforceable against Spiegel, and therefore the SAC remains in effect. For that reason, the counterclaim defendants’ motion for summary judgment is denied as to Count X, and summary judgment shall enter in favor of Spiegel on this count.
III. The Complaint—Declaratory Judgment (Count V)
Underlying Hunneman’s requests for relief in its Complaint is the argument that the March Document, rather than the SAC, controls Spiegel’s equity interest. In Count v. of the Complaint, Hunneman seeks alternative relief in the form of a declaratory judgment that its interpretation of II.C. is correct, and specific performance based thereon. Hunneman now seeks summary judgment as to Count v. of the Complaint. As determined with respect to Count I, supra, the March Document is unenforceable and the SAC is the controlling document. Hunneman’s interpretation of II.C. is correct as a matter of law. Whether Hunneman has any remaining obligations under II.C. turns on the issue of whether Spiegel voluntarily resigned or was constructively terminated without cause.
For this reason, Hunneman’s motion for summary judgment as to Count v. of the Complaint is allowed with respect to the issues of the controlling document and interpretation of II.C. Summary judgment is denied as to Hunneman’s request for specific performance of II.C.
ORDER
For the foregoing reasons, counterclaim defendant Stuart Pratt’s Motion for Summary Judgment is ALLOWED as to Counts I and II, as to Count III with respect to the issue of a breach of SAC Section II.C., Count V, and as to Count VI with respect to the issue of a breach of SAC Section II.C. Pratt’s Motion for Summary Judgment is DENIED as to Count III with respect to the issue of a freeze-out, as to Count IV, as to Counts VI and VII with respect to the issue of allocations of corporate funds, and as to Counts VIII, IX, and X of the Counterclaim.
Counterclaim defendant Fort Point Commercial Company’s Motion for Summary Judgment is DENIED as to Counts I and II, as to both aspects of Count III, Count IV, as to both aspects of Counts VI and VII, as to Counts VIII, IX, and X of the Counterclaim, and as to Count v. of its Complaint with respect to the request for specific performance. Counterclaim defendant Fort Point Commercial Company’s Motion for Summary Judgment is ALLOWED as to Count v. of the Counterclaim and as to Count v. of its Complaint with respect to the issues of the controlling document and interpretation of SAC Section II.C.
Counterclaim defendants Fort Point Management & Development Corporation and Fort Point Appraisal Corporation’s Motion for Summary Judgment is DENIED as to both aspects of Counts VI and VII, and as to Counts VIII and X. Counterclaim defendants Fort Point Management & Development Corporation and Fort Point Appraisal Corporation’s Motion for Summary Judgment is ALLOWED as to Count IX of the Counterclaim.
Summary judgment is ALLOWED in favor of counter-claimant Wayne Spiegel on Count X of the Counterclaim.

The counterclaim defendants refer to this document as the “March 2008 Agreement.” Spiegel calls it the “April 2nd Proposal." The court will refer to it as the “March Document.”

Spiegel contends that he now holds an eleven-percent equity interest in Hunneman. He argues that because of a settlement between Hunneman and Robert Fitzgerald, another minority shareholder, Hunneman redeemed Fitzgerald’s interest and distributed it pro rata to the other shareholders, leaving Spiegel with an eleven-percent interest. *347 Hunneman consistently maintains that Spiegel’s interest was ten percent until the March Document reduced it to three percent. Thus, it appears that Spiegel’s true percent ownership is a disputed factual issue that may bear on any ultimate award of damages.

Hunneman also advances the derivative argument with respect to Count V, promissory estoppel. As discussed in CountV, infra, summary judgment is allowed on Count v. on a different ground.

In Count I, Spiegel alleges that Pratt and Hunneman also breached the SAC by failing to provide him with an accurate accounting. Pratt correctly asserts that the SAC does not contain an accounting provision. The court therefore does not address it as a ground for breach of contract.

See Donahue, 367 Mass. at 588-89 (“The [persons who employ freeze-out techniques] may refuse to declare dividends; they may drain off the corporation’s earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, or in the form of high rent by the corporation for property leased from majority shareholders ...; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders . . .”).